# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------x

In re:

MADISON NICHE ASSETS
FUND, LTD. (IN OFFICIAL
LIQUIDATION),[1] *et al.*,

            Debtors in
            Foreign Proceedings.

Chapter 15

Case No. 16- 10043  ( )

(Joint Administration Requested)

------------------------------------------------------------x

## DECLARATION OF CHRISTOPHER BARNETT KENNEDY
### IN SUPPORT OF CHAPTER 15 PETITIONS FOR
### RECOGNITION AS FOREIGN MAIN PROCEEDINGS

I, **CHRISTOPHER BARNETT KENNEDY** hereby declare under penalty of perjury under

the laws of the United States as follows:

1.      My colleague Matthew James Wright and I are the duly appointed joint official

liquidators of Madison Niche Opportunities Fund, Ltd. (in Official Liquidation) ("**Opportunities**

**Fund**") and Madison Niche Assets Fund, Ltd. (in Official Liquidation) ("**Assets Fund**" and together

with Opportunities Fund, the "**Funds**") (the "**Official Liquidators**"). The liquidations of the Funds

are both currently subject to the supervision of the Financial Services Division of the Grand Court of

the Cayman Islands (the "**Grand Court**") (cause nos. FSD 0035 of 2015 (ASQC) (re the Assets

Fund) and 0036 of 2015 (ASQC) (re the Opportunities Fund)), as a result of the Official Liquidators'

---

[1] The last four digits of the United States Tax Identification Number, or similar foreign identification number, as applicable, follow in parentheses:  Madison Niche Assets Fund, Ltd. (in Official Liquidation) (1425) and Madison Niche Opportunities Fund, Ltd. (in Official Liquidation) (0084).  The Funds' registered office is 2nd Floor, Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman, KY1-1103.

#38099374_v2

petitions to the Grand Court for its supervision under section 131 of the Companies Law of the Cayman Islands (2013 Revision) (the "**Companies Law**") (the "**Cayman Liquidations**").

2.      I respectfully submit this declaration (the "**Declaration**") in support of the Official Liquidators' petitions seeking recognition of the Cayman Liquidations pursuant to 11 U.S.C. § 1517(b)(1) as foreign main proceedings pursuant to the Bankruptcy Code, as described in detail below (the "**Petitions**").

3.      I am a qualified insolvency practitioner and a director of RHSW (Cayman) Limited ("**RHSW**"). My colleague and fellow Official Liquidator, Mr. Wright, also is a qualified insolvency practitioner of RHSW. We both meet the statutorily proscribed requirements under the Cayman Islands Insolvency Practitioners' Regulations (2008 Revision) to act as Official Liquidators. We both work out of the offices of RHSW, which are located at 2nd Floor, Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman, KY1-1103, Cayman Islands.

4.      I am duly authorized to make this Declaration on behalf of the Official Liquidators. I am fully familiar with the facts of this matter as a consequence of my day to day conduct of the Cayman Liquidations. Unless otherwise indicated, all statements contained herein are true to the best of my knowledge and based upon my personal knowledge of the Funds' operations and financial condition, my review of relevant documents and from my conversations with relevant personnel. I am over the age of 18 and, if called to testify, would testify competently about the facts set forth herein.

5.      I am familiar with the Model Law on Cross-Border Insolvency, adopted by the United Nations Commission on International Trade Law (UNCITRAL), and approved by a resolution of the United Nations General Assembly on 15 December 1997. I also understand that the Model Law has been adopted in the United States as chapter 15 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq*. (the "**Bankruptcy Code**").

6.     I make this Declaration in my statutory capacity as an officer of the Grand Court, and request an extension of comity for the benefit of all of the Funds' creditors and investors, whose interests I represent.

7.     On 6 March 2015, Mr. Wright and I, acting in our then capacities as joint voluntary liquidators of the Funds issued petitions to the Grand Court under section 131 of the Companies Law seeking, among other orders, orders that: the voluntary liquidation of the Funds continue under the supervision of the Grand Court; Mr. Wright and I as joint voluntary liquidators of the Funds be appointed as the Official Liquidators of the Funds; and the Official Liquidators be granted certain powers in our capacities as the Official Liquidators of the Funds, including the powers to bring or defend any action or legal proceeding on behalf of the Funds (the "**Supervision Petitions**"). True and correct copies of the Supervision Petitions are attached hereto as **Exhibit A**.

8.     On 11 March 2015, the Grand Court made orders  in the terms sought by the Supervision Petitions (the "**Supervision Orders**").   True and correct copies of the Supervision Orders are attached hereto as **Exhibit B**.

9.     For the reasons discussed below, I submit that: (i) I am a duly appointed "foreign representative" of the Cayman Liquidations and that the Cayman Liquidations constitute "foreign proceedings" within the meaning of sections 101(23) and (24) of the Bankruptcy Code, respectively, (ii) this case was properly commenced in accordance with the requirements of chapter 15 of the Bankruptcy Code; and (iii) the Cayman Liquidations satisfy all the requirements to be recognized as "foreign main proceedings" pursuant to sections 1502(4) and 1517(b)(1) of the Bankruptcy Code.

## I.     General Background

9.     The Funds both belong to a group of companies (the "**Madison Group**") that is ultimately controlled by Madison Capital Management, LLC ("**Madison**"). Each of the Funds, via a

#38099374_v2

number of intermediary vehicles, holds shares in special purpose vehicles set up to own and operate specific assets into which the Funds' participating shareholders are ultimately invested (the "**Opcos**").

10.     Both Funds were incorporated as exempted limited companies under the laws of the Cayman Islands: the Opportunities Fund was incorporated on 23 September 2002, and the Assets Fund on 8 November 2004.

11.     Both Funds were formerly registered as mutual funds and regulated by the Cayman Islands Monetary Authority ("**CIMA**"). Following their simultaneous entry into voluntary liquidation (described below), both Funds' CIMA licences were terminated.

12.     Prior to their simultaneous entry into voluntary liquidation, both Funds' registered addresses were c/o DMS House, 20 Genesis Close, P.O. Box 314, Grand Cayman, KY1-1104. Following their entry into voluntary liquidation, their registered addresses were changed to c/o The R&H Trust Co., Ltd., Windward 1, Regatta Office Park, PO Box 897, Grand Cayman KY1-1103, Cayman Islands.

13.     The Funds serve as feeder funds for: in the case of the Opportunities Fund, Madison Niche Opportunities Master Fund, Ltd. (in Voluntary Liquidation) ("**MNOMF**"); and in the case of the Assets Fund, Madison Niche Assets Master Fund, Ltd. (in Voluntary Liquidation) ("**MNAMF**" and together with MNOMF, the "**Master Funds**"). The Official Liquidators are appointed as the joint voluntary liquidators of the Master Funds.

14.     In addition to the Funds, two further funds act as feeder funds into the Master Funds. They are both registered in Delaware and are known as: Madison Niche Opportunities Fund, LLC (in Voluntary Liquidation), which feeds into MNOMF ("**MNOF LLC**"); and Madison Niche Assets Fund, LLC (in Voluntary Liquidation), which feeds into MNAMF ("**MNAF LLC**" and together with

MNOF LLC, the "**Onshore Feeder Funds**"). The Official Liquidators are also appointed as the joint voluntary liquidators of the Onshore Feeder Funds.

15.     In summary, the Official Liquidators are presently appointed as the joint official liquidators of the Funds and as the joint voluntary liquidators of the Master Funds and Onshore Feeder Funds. The Official Liquidators do not currently consider it necessary to petition for chapter 15 recognition of the Master Funds or the Onshore Feeder Funds so in the interests of succinctness I will focus solely on the Funds for the balance of this declaration.

16.     By the Funds' offering documents, namely, Explanatory Memorandums dated February 2007 (the "**Offering Documents**"), the Funds offered Participating Shares to prospective investors. The Funds' investment objective was defined in the Offering Documents as follows:

> "to provide investors with superior risk-adjusted returns and low volatility by investing in non-traditional securities and financial instruments purchased from the issuer or originator or in the secondary market, and that are, in most cases, related to, backed by or derive value from real estate assets and are purchased at a discount to value, or are high-yield oriented…"

17.     The investment strategy of the Funds was defined as follows:

> "to acquire generally, indirectly through an investment in the Master Fund, non-traditional securities and financial instruments (a) that are, except as described in this paragraph, related to, backed by or derive value from real estate as determined by the Investment Manager, (b) not typically actively traded on any exchange, and (c) that generally exhibit at least one of the following four characteristics: (I) fractionalization (*i.e.*, the Fund aggregates small, fractionalized securities and financial instruments directly from a myriad of small holders), (II) institutionally overlooked (*i.e.*, the Fund focuses on securities and financial instruments with limited institutional investor/broker interest and/or suitability and no "street" research coverage), (III) illiquidity (*i.e.*, the Fund provides liquidity to holders of illiquid financial instruments), or (IV) capital supply constraints (*i.e.*, the Fund makes high-yield investments in niches of the real estate market which are underserved because of small transaction sizes, non-conventional asset classes, complex/unusual transaction terms, short investment duration, unconventional underwriting parameters, etc.) …"

#38099374_v2

18.    The assets of each of the Funds consist solely of the shares of the corresponding Master Fund that it feeds. As such, the financial position of each Fund is dependent upon the performance of the Master Fund in which it holds an interest and, in turn, the value of the assets in which the Master Fund holds interests. Through the Master Funds and certain intermediary holding companies, the Funds are invested into the following Opcos:

a.    Madison Vineyard Holdings, LLC, a Delaware limited liability company concerning the ownership and operation of a vineyard located in Napa Valley, California known as the Jamieson Ranch ("**JRV**"). With respect to this asset, Opportunities Fund holds a 37.9% interest, and Assets Fund holds a 56.5% interest;

b.    Madison Fort Lauderdale, LLC, a Delaware limited liability company concerning the ownership of development-potential real estate located in Fort Lauderdale, Florida known as Hampton Inn ("**Fort Lauderdale**"). With respect to this asset, Opportunities Fund holds a 54.8% interest, and Assets Fund holds a 39.5% interest;

c.    Red Mesa Holdings / O&G, LLC, a Delaware limited liability company which owns and operates oil and gas drilling concerns located in La Plata County, Colorado ("**Red Mesa**"). Opportunities Fund holds a 90.3% interest in Red Mesa, and Assets Fund does not hold an interest in it (as described more fully below);

d.    United American Energy, LLC, a Delaware limited liability company that owns and operates oil and gas drilling concerns located in Beattyville, Kentucky. Opportunities Fund holds an 88.8% interest with respect to this asset, and Assets Fund is not invested in it; and

e.    Sagebrush Holdings / O&G LLC, a Delaware limited liability company that owns and operates oil and gas drilling concerns located in North Dakota. Opportunities Fund holds a 90.2% interest with respect to this asset; Assets Fund is not invested in this asset.

19.    Additionally, as of August 31, 2015, Opportunities Fund held gross cash in the amount of $15,252.17 (subject to currency fluctuations), and Assets Fund held cash in the amount of $938,304.40 (subject to currency fluctuations).

20.    As of December 10, 2015, the Official Liquidators have identified liabilities of the Funds, principally comprised of legal fees, insurance costs, and certain general operational expenses incurred by the underlying assets, in the following amounts:

      a.     Assets Fund: $278,866.46; and

      b.     Opportunities Fund: $600,933.53.

## II.    **Entry by the Funds into voluntary liquidation**

21.    By supplementary memoranda dated 12 November 2010, the Funds' investors were notified that a wind down strategy for the Funds had been devised, which would culminate in the Funds' entry into voluntary liquidation.

22.    On 26 June 2014 the directors of both of the Funds resolved to recommend to the sole voting ordinary shareholders of both Funds (together, the "**Shareholders**") that the Funds be wound up voluntarily and that the Official Liquidators be appointed as the joint voluntary liquidators of the Funds.

23.    As a consequence of special written resolutions passed by the Shareholders of both of the Funds, the Funds entered into voluntary liquidation on 1 July 2014 under section 116(c) of the Companies Law.

24.    As required by the Companies Law, the Official Liquidators (acting then in their capacities as the joint voluntary liquidators of the Funds) filed consents to act as the voluntary liquidators of the Funds;[2] directors' solvency declarations;[3] and notices of winding up with the

---

[2] Section 123 (1)(b) of the Companies Law.
[3] Section 123 (1)(c) of the Companies Law.

#38099374_v2

Registrar of Companies[4] (the "**Registrar**") on 1 July 2014. They also placed notice of their appointments in the Cayman Islands Gazette,[5] which was published on 14 July 2014.

25.    Comparable procedures were also followed in relation to the Master Funds and the Onshore Feeder Funds, the corollary of which was that the Official Liquidators were duly appointed as the joint voluntary liquidators of the Funds, the Master Funds and the Onshore Feeder Funds as of 1 July 2014.

**III.    Events leading up to the Cayman Liquidations**

26.    As set out above, in accordance with the wind down communicated to the investors of the Funds, on 1 July 2014 the Funds were placed into voluntary liquidation and Mr. Wright and I were appointed as their joint voluntary liquidators. Several factors, including the bankruptcy of Red Mesa (as described below) and the escalating dispute arising out of the Consulting Agreement, as described below, culminated in the Official Liquidators' determination that petitioning the Grand Court for an order that the liquidation of the Funds be brought under its supervision, was in the best interests of the Funds and their respective creditors.

**A.    Red Mesa**

27.    Red Mesa's financial condition was severely impacted by a variety of factors, including a rapid decline in oil prices in mid to late 2014 and the depression of gas value due to overproduction, which resulted in an imbalance between the cost of operation and the value of production. Red Mesa's precarious financial position was exacerbated when the Colorado Oil and Gas Conservation Commission ("**COGCC**") commenced an intervention action demanding that Red

---

[4] Section 123 (1)(a) of the Companies Law.
[5] Section 123 (1)(e) of the Companies Law.

Mesa post additional statutory financial assurance bonds with respect to capping abandoned wells. Facing mounting liabilities and decreased production value, Red Mesa was rendered insolvent.

28.     On 13 March 2015, Red Mesa filed a petition for relief under chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (Case No. 15-10570-KJC), listing assets in the total amount of $393,726.75 and liabilities of $383,694.32, plus certain unliquidated, contingent, and disputed liabilities owing to the COGCC. In spite of extensive pre- and post-petition efforts to market its assets for sale, the highest and best offer Red Mesa received for substantially all of its assets was $165,000, which sale was approved by the Bankruptcy Court pursuant to section 363(f) of the Bankruptcy Code by order dated 23 September 2015 [Docket No. 59].

29.     In light of Red Mesa's insolvency, the Official Liquidators were advised by their United States legal advisors that there was a risk that the COGCC could seek to enforce its financial sanctions imposed upon Red Mesa by attaching other assets of Opportunities Fund, including those in which Assets Fund is co-invested, thereby threatening the value of both of the Funds. Faced with this risk, the Official Liquidators determined that the Funds' should seek the protection offered by the supervision of the Grand Court.

30.     Following entry of the Supervision Orders, the Official Liquidators took the various steps required under the Companies Law and the Companies Winding Up Rules of the Cayman Islands (2008 Revision) (the "**CWR**"), including the publication of statutory notices and the convening of meetings of creditors of the Funds. At the first meeting of the creditors of the Funds, liquidation committees, comprised by nominated representatives of the Funds' investors, were elected (the "**Liquidation Committees**"). The Liquidation Committees continue in their role of assisting the

Official Liquidators; they are both aware of and support the presentation by the Official Liquidators of the Petitions.

### B.    The Consulting Agreement

31.    Following the Funds' entry into voluntary liquidation, the Funds, acting by the Official Liquidators, entered into a consulting agreement with TMC Consulting Services, LLC ( "**TMC**"), dated 1 July 2014, as subsequently amended and restated on 23 September 2014 and 15 October 2014 (the "**Consulting Agreement**"), a true and correct copy of which is attached hereto as **Exhibit C**. The terms of the Consulting Agreement were settled by the former directors of the Funds prior to the appointment of the Official Liquidators (then acting as joint voluntary liquidators). Pursuant to the Consulting Agreement, TMC, (a Delaware LLC that is also a member of the Madison Group and whose principle is the former director of both of the Funds – Mr. Bryan Gordon) agreed to provide management services for the Funds and the Opcos, for an initial monthly fee of $708,333.00 (the "**Consulting Fees**"). The Consulting Agreement provided that the Consulting Fees were to ratchet downwards as each of the assets owned by the Opcos were disposed of, in line with the Funds' liquidation strategies.

32.    Although the Consulting Fees represented a significant decrease compared to the asset management fees charged by TMC prior to the appointment of the Official Liquidators, the Liquidation Committees (once appointed) began to voice concern to the Official Liquidators over the Consulting Fees, and requested that the Official Liquidators conduct a review of previous payments made by the Funds to other members of the Madison Group, including management fees, consultancy fees, disposal bonuses, and participation fees. Once recognition is obtained, the Official Liquidators contemplate making an application for discovery, *inter alia,* with respect to the United States-based management of the Madison Group assets.

IV.    **Events leading up to the Petitions**

33.    In May 2015, the Official Liquidators discovered that TMC had breached the terms of the Consulting Agreement by expending funds purportedly on behalf of an Opco under TMC's qualified authority for the wrongful purpose of supporting another (insider) Madison Group entity's operation at the ultimate expense of the Funds.  By letter dated 3 June 2015, the Official Liquidators notified TMC that this constituted a breach of the Consulting Agreement, which, given that it also amounted to a breach of TMC's duty to act in good faith, was considered to be incurable and that the Official Liquidators intended to terminate the Consulting Agreement at the conclusion of the 30 day period required under the Consulting Agreement, 3 July 2015. TMC denied any breach had been committed, and demanded immediate payment of Consulting Fees it considered due under the Consulting Agreement.  Within a few days thereafter,  TMC submitted a notice of resignation in respect of Madison's Vineyard Holdings LLC and its management thereof.  The Official Liquidators informed TMC that they would deal with any sums due to TMC under the Consulting Agreement in accordance with their statutorily enshrined duties as official liquidators.

34.    On 18 June 2015, TMC commenced litigation against RHSW and Matthew Wright and I by filing a complaint for breach of contract in the United States District Court for the District of Delaware (Case No. 15-512-SLR, the "**District Court Litigation**"), a true and correct copy of which is attached hereto as **Exhibit D**.  The Consulting Agreement was entered into by the Official Liquidators as agents on behalf of the Funds as disclosed principals. Despite this, TMC named Matthew Wright and I, and our employer RHSW as defendants. The Official Liquidators believe that TMC wrongfully named us and RHSW, non-parties to the Consulting Agreement, in a bad faith attempt to exert collateral pressure.  Moreover, further evidencing bad faith, TMC declined to name

any of the principal funds that were parties to the Consulting Agreement, including Funds that are the subject of the instant Petitions.

35.    The Official Liquidators filed an omnibus motion to dismiss the District Court Litigation and accompanying opening brief in support thereof on 28 October 2015.    Wrongfully named non-contract party RHSW similarly filed a motion to dismiss at the expense of the Funds, with the approval of the Liquidation Committees.    On 16 November 2015, TMC filed a Notice of Dismissal in respect of the District Court Litigation, without prejudice, a true and correct copy of which is attached hereto as **Exhibit E**.

36.    On 16 November 2015, TMC filed a new complaint for breach of contract arising out of the Consulting Agreement against Matthew Wright and I, the Funds, the Master Funds, and the Onshore Feeder Funds in the Superior Court for the State of Delaware (Case No. N15C-11-132 EMD CCLD, the "**Delaware Litigation**"). A true and correct copy of the new Delaware Litigation complaint is attached hereto as **Exhibit F**.    On 28 December 2015, Matthew Wright and I filed a motion to dismiss the Delaware Litigation and accompanying opening brief in support thereof.

**V.    Qualifications for recognition and jurisdiction in the United States**

37.    I have been advised that in order to qualify for recognition under chapter 15, the Petitions must meet certain requirements.    In particular, it must be brought by a "foreign representative" in respect of a "foreign proceeding" that is pending before a "foreign court," all as defined in the Bankruptcy Code.

38.    I am aware of the definition of "foreign representative" as referred to in 11 U.S.C. § 101(24) and believe that the Official Liquidators qualify as such.    The Official Liquidators were appointed by the Grand Court pursuant to the Companies Law and the CWR to act as the joint official liquidators of the Funds.    Among other things, the Official Liquidators are charged with

administering and liquidating the business and assets of the Funds and acting on behalf of the Funds. The Official Liquidators are also authorized to bring or defend any action or legal proceeding in the name or on behalf of the Funds, for the benefit of their estates. As such, the Official Liquidators are the persons responsible for representing the Funds in the Cayman Liquidations and in all related matters, including this matter, are therefore their "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code.

39.     I also have been advised that a "foreign court" is defined in section 1502 of the Bankruptcy Code as "a judicial or other authority competent to control or supervise a foreign proceeding." I respectfully submit that the Grand Court qualifies as a foreign court for purposes of section 1502.

40.     I understand that a "foreign proceeding" is defined as "a collective judicial . . . proceeding in a foreign county . . . under a law relating to insolvency or the adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23). The Cayman Liquidations qualify as such, since by definition they are liquidation proceedings pursuant to and governed by the Cayman insolvency law under the supervision of the Grand Court for the benefit of all of the Funds' creditors, investors and parties in interest.

41.     I am also aware that section 1517(b)(1) provides that a foreign proceeding shall be recognized as a "foreign main proceeding" if the foreign proceeding is pending in the country where the debtor has "the center of its main interests" ("**COMI**"). I understand that section 1516(c) of the Bankruptcy Code provides that a debtor's "registered office" is presumed to be the debtor's COMI in the absence of evidence to the contrary. As demonstrated by the facts included herein, I further believe that the Funds are engaged in non-transient economic activity in the Cayman Islands.

42.     As noted above, both Opportunities Fund and Assets Fund were formed under the laws of the Cayman Islands and maintained their registered offices there.  I believe that there is no basis for rebutting the statutory presumption, and that, in any case, the facts clearly indicate that the Funds' COMI is the Cayman Islands.

43.     As an initial matter, substantial assets of the Funds - including almost all of the Funds' known liquid assets (*i.e.*, the Funds' bank account balances) - are located in the Cayman Islands.

44.     I have reviewed voluminous documentation issued by and to both Funds. In all such documentation, each of the Funds are referred to and addressed as a Cayman Islands company. Based upon the board meetings, statutory demands and resolutions to wind up the Funds, shareholders meetings and the voluntary liquidation of the Funds themselves, all of which focused on the Cayman Islands, I believe that all relevant creditors, stakeholders, and shareholders regard the Funds to be Cayman Islands companies.

45.     As Official Liquidators, we have displaced the boards of directors of the Funds, the Funds are in liquidation before a Cayman Islands court (the Grand Court). All creditors of the Funds may submit their claims in the Cayman Liquidations, and all claimants have the right to access the Grand Court and appeal decisions of the Official Liquidators.  Moreover, the liquidation of the Funds and their remaining affairs are being conducted from the Cayman Islands.

46.     Substantially all of the work to date relating to the Cayman Liquidations (and post-liquidation activities) has been conducted in the Cayman Islands and all of the work is supervised by me and my fellow Official Liquidator, and, ultimately, subject to the supervision of the Grand Court.

47.     Initially, my colleagues in the Cayman Islands and I caused the requisite notices and filings to be filed, published and served, arranged for the resignation of the Funds' existing directors and for the transfer of the Funds' books and records to RHSW, as the Funds' new registered office.

#38099374_v2

48.    We also have taken steps to protect and realize the Funds' assets. For example, the Official Liquidators conducted the sale of the business and assets of JRV in September 2015, and are currently working with a selling agent to market and sell Fort Lauderdale.

49.    The Official Liquidators also have taken steps to secure and recover the Funds' assets and have taken control of the Funds' bank accounts, the proceeds of which are held in the Cayman Islands. To date, approximately $7,448,708.98 has been recovered. In addition, the Funds hold approximately $9,718.91 in their U.S. bank accounts to cover minor expenses.

50.    The Official Liquidators likewise have engaged in substantial formal and informal correspondence with the Funds' former principals and all relevant stakeholders, including the Liquidation Committees, from the Cayman Islands, toward arriving at liquidation strategy consensus and handling the day-to-operations of the Funds' operating assets.

51.    As the Official Liquidators' investigations continue, the relationships of the Funds, their operations, and potential claims against third parties are becoming clearer.  Potential claims will be overseen, managed and resolved (by litigation or negotiation) by the Official Liquidators from the Cayman Islands.

52.    As of 31 August 2015, the Official Liquidators had engaged in over 766.7 hours in the performance of their duties with respect to the Funds' since their appointment.

53.    For these reasons, believe it is clear that the Funds' "nerve center" has been the Cayman islands since the commencement of the Cayman Liquidations, and similarly that the Cayman Islands is the Funds' center of main interests.

54.    In accordance with 11 U.S.C. § 1515(c), I am aware of no other pending foreign insolvency proceedings, except the Cayman Liquidations, in which the Funds are the subjects of the proceedings.

#38099374_v2

55.     In accordance with Rule 1007-1(a)(4) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Delaware Litigation, as described above, is the only known and pending action in the United States in which either Opportunities Fund or Assets Fund is named as a party. The Delaware Litigation, which directly names as defendants not only the Funds, but also the Master Funds and the only other investors in the Master Funds (the Onshore Feeder Funds), presents a clear threat of diminution of the Funds' assets, and the Official Liquidators are authorized under Cayman Islands law to act on behalf of the Funds in defending against the Delaware Litigation. The Funds also do not seek provisional relief against any party at this time. The disclosures required under Bankruptcy Rule 7007.1 are attached hereto as **Exhibit G**.

56.     For all of these reasons, I respectfully request that this Court enter an Order (i) recognizing my colleague, Matthew James Wright, and myself as duly authorized foreign representatives of Opportunities Fund and Assets Fund and the Cayman Liquidations as foreign main proceedings under chapter 15 of the Bankruptcy Code, and (ii) granting such other and further relief as this Court may deem just and proper.

Pursuant to Section 1746 of Title 28 of the United States Code, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: Grand Cayman, Cayman Islands

January 8, 2016

_____
**CHRISTOPHER BARNETT KENNEDY**
*Joint Official Liquidator of Madison Niche Opportunities Fund, Ltd. (in Official Liquidation) and Madison Niche Assets Fund, Ltd. (in Official Liquidation)*

## EXHIBIT A

**Supervision Petitions**

#38099374_v1

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 0035 OF 2015

IN THE MATTER OF SECTION 131 OF THE COMPANIES LAW (2013 REVISION)

AND IN THE MATTER OF MADISON NICHE ASSETS FUND, LTD. (IN VOLUNTARY LIQUIDATION)

MAR 06 2015

PETITION

TO: THE GRAND COURT

THE HUMBLE PETITION of **MATTHEW WRIGHT** and **CHRISTOPHER KENNEDY** of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, PO Box 897, Grand Cayman KY1-1103, Cayman Islands, as joint voluntary liquidators ("**JVLs**") of Madison Niche Assets Fund, Ltd. (in voluntary liquidation) (the "**Fund**") shows that:

**Incorporation**

1.     The Fund is an exempted limited company and was incorporated under the laws of the Cayman Islands on 8 November 2004. Its registered office is c/o RHSW (Cayman) Limited, Windward 1, Regatta Office Park, PO Box 897, Grand Cayman KY1-1103, Cayman Islands.

2.     The Fund serves as a feeder fund for Madison Niche Assets Master Fund, Ltd (the "**Master Fund**"). The Master Fund is also in voluntary liquidation and the JVLs are appointed as its joint voluntary liquidators.

**Method by which the Fund was put into voluntary liquidation**

3.     On 26 June 2014 the directors of the Fund passed a board resolution that its directors recommend to Madison Capital Advisors 1, LLC in its capacity as the sole voting shareholder of the Fund (the "**Voting Shareholder**") that it be wound up voluntarily and that the JVLs be appointed as its joint voluntary liquidators.

4.  Then, on 1 July 2014 the Voting Shareholder passed resolutions, as special written resolutions, that:

    (a)  the business and affairs of the Fund be voluntarily wound up in accordance with section 116(c) of the Cayman Islands' Companies Law (2013 Revision) (the "**Law**"); and

    (b)  the JVLs be appointed as the joint voluntary liquidators of the Fund.

5.  The JVLs filed consents to act as voluntary liquidators of the Fund with the Registrar of Companies on 1 July 2014.

6.  Special resolutions were also passed on 1 July 2014 to appoint the JVLs as joint voluntary liquidators of certain other members of the group to which the Fund belongs, being:

    (a)  the Master Fund;

    (b)  Madison Niche Opportunities Fund, Ltd ("**MNOF**"); and

    (c)  Madison Niche Assets Opportunities Fund, Ltd.

**Declaration of solvency**

7.  On 1 July 2014, the then directors of the Fund provided a signed declaration of solvency.

8.  Notwithstanding that a declaration of solvency was received, the JVLs are of the view that the winding up of the Fund under the supervision of the Court will result in a more effective, economic and expeditious liquidation of the Fund.

**Consent to appointment as Official Liquidators**

9.  The JVLs are qualified insolvency practitioners and consent to being appointed as Joint Official Liquidators of the Fund.

**Financial position of the Fund**

10.    The Fund is a feeder fund for the Master Fund and accordingly its sole asset is
       its shares in the Master Fund.

11.    The Fund holds 93.8% of the shares in the Master Fund. The remaining 6.2% of
       the shares in the Master Fund are held by Madison Niche Assets Fund, LLC (the
       **"Onshore Feeder Fund"**).

12.    The Fund therefore has an interest in the assets of the Master Fund after
       payment of other creditors in accordance with the Law and its financial position is
       dependent upon both the Master Fund's financial performance and the value of
       its assets.

13.    As of 4 March 2015, the Fund's assets are comprised by:

       (a)    cash of US$2,280,874.93 (subject to currency fluctuations);

       (b)    interests in the following investments, which are held via the Master Fund,
              and certain other intermediary holding companies:

              (i)    Madison Vineyard Holdings, LLC, in respect of which the Fund
                     holds a 56.5% interest. This investment concerns the ownership
                     and operation of a vineyard located in the Napa Valley, California
                     and known as Jamieson Ranch. A recently conducted valuation
                     values it between US$19,000,000 and US$30,000,000; and

              (ii)   Madison Fort Lauderdale, LLC, in respect of which the Fund holds
                     a 39.5% interest. This investment concerns the ownership of
                     development-potential real estate located in Fort Lauderdale,
                     Florida and known as Hampton Inn. The manager of this asset
                     has valued it at between US$3,500,000 and US$5,400,000,
                     although it is currently encumbered by bridging loan obligation,
                     worth US$930,000.

14.    As of 4 March 2015, current liabilities of the Fund are US$64,414.19 which are comprised principally by legal, insurance and some general operational expenses incurred by the underlying assets.

**The financial position of the Master Fund**

15.    As of 4 March 2015, the Master Fund holds cash totalling US$19,472.60 in addition to a small number of securities of minimal value. However, this financial position (and consequently, the financial position of the Fund) may be subject to significant change due to significant liabilities which continue to accrue against an asset known as "Red Mesa", which although not owned by the Fund, poses a threat to the realisations the Fund may be able to make, for the reasons set out below.

**Red Mesa**

16.    Red Mesa Holdings / O&G, LLC is an entity which owns and runs oil and gas drilling concerns located in La Plata County, Colorado ("**Red Mesa**"). The Fund is not invested into Red Mesa. However, MNOF (which is described at **paragraph 6 (b)** above) holds a 90.3% interest in Red Mesa.

17.    Red Mesa is now hopelessly insolvent, and will enter into chapter seven bankruptcy shortly in the United States. The main reason Red Mesa is insolvent is due to significant contingent liabilities facing it, which have arisen as a consequence of intervention against it by the Colorado Oil and Gas Conservation Commission (the "**Regulator**").

18.    The Regulator is responsible for promoting the responsible development of Colorado's oil and gas natural resources and is statutorily empowered to impose conditions, fines, levies and/or restrictions which it considers necessary to prevent or mitigate any potentially adverse environmental impact that drilling entities such as Red Mesa might have.

19.    The entry by Red Mesa into bankruptcy, and the circumstances which precipitated it have necessitated the presentation of this petition because the JVLs' United States advisors have advised that there is a risk of the Regulator seeking to "pierce the corporate veil" when imposing financial sanctions. This

would mean that the Regulator may seek to diminish or encumber other assets into which MNOF is invested and despite the separate legal ownership of such assets. The threat jeopardises the value of those assets described a **paragraphs 13(b)(i)** and **13(b)(ii)** above, because the Fund and MNOF are co-invested in them.

20.    The JVLs therefore consider that it accords with their duty to the creditors and investors of the Fund, to seek the protection of the Court against any attempts by the Regulator to encumber or diminish these assets.

**Court supervision will result in a more effective, economic and expeditious liquidation process**

21.    The JVLs also consider that the supervision of the Court will result in a more effective, economic and expeditious liquidation process. This is because a Court supervised process will:

(a)    allow them to carry out a comprehensive investigation into the Fund's affairs, including any claims that may vest in the Fund against any third parties, for the benefit of creditors;

(b)    assist in preventing any disposition of the Fund's property or the transfer of its shares or alteration in the status of the Fund's members unless by the order of the Court;

(c)    assist in the orderly distribution of the Fund's assets.

**Investor consent**

22.    The Fund's shareholders (the "**Investors**") are a dissimilar body ranging from household name institutional investors that hold over 10% of the issued share capital of the Fund, to minor investors holding less than 0.02% of the issued share capital of the Fund. On those occasions that the JVLs have written to the Investors some have responded, but many have not. The JVLs consider this is reflective of the quantum and disparate nature of the Investors.

23.     Accordingly, and in order to seek to establish a productive forum for Investor communication, the JVLs wrote to all investors of the Fund following their appointment and convened a meeting at which an informal liquidation committee was appointed (the "**LC**"). The LC was appointed on 25 November 2014 and since its appointment the JVLs have had regular update calls with the LC, as well as ongoing ad-hoc communication with various of the LC members.

24.     Following the receipt of advice that Red Mesa was due to enter into bankruptcy, and that the Regulator may seek recourse against assets into which both the Fund and MNOF are invested, the JVLs immediately contacted the LC and arranged a teleconference to provide an update: the teleconferences took place on 27 February 2015 and on 4 March 2015. On them, the JVLs explained developments and the rationale behind their desire to move into Court-supervised liquidation.

25.     As at the date of this petition, all LC members have indicated that they support the Fund's entry into Court-supervised liquidation.

26.     On 2 March 2015 the JVLs also wrote to all investors of the Fund informing them that the JVLs intended to make an application for the liquidation of the Fund to be brought under the supervision of the Court. Given the urgency the JVLs requested that any Investor who opposed this petition provide notification of such opposition by midday (Cayman time) on Thursday 5 March 2015.

27.     As at the date of this petition, the JVLs have received no communication from any Investors indicating opposition, and as such the JVLs are of the view that no Investors oppose the petition. In the event that the JVLs receive any notification indicating disapproval between the date of this petition, and the date that the summons on this petition is heard, they will immediately inform the Court in writing. The JVLs will also provide all Investors with details of the date and time of the hearing of the summons on the petition, so that they can attend or be represented should they wish to.

**Conclusion**

28.    For the reasons set out above, the JVLs seek an order pursuant to section 131(b) of the Law that that the liquidation of the Fund continue under the supervision of the Court and that the JVLs be appointed as the joint official liquidators of the Fund.

**YOUR PETITIONER THEREFORE HUMBLY PRAYS THAT:**

29.    The liquidation of the Fund continue under the supervision of the Court.

30.    Matthew Wright and Christopher Kennedy of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, West Bay Road, Grand Cayman KY1-1103, Cayman Islands, be appointed as Joint Official Liquidators ("**JOLs**") of the Fund.

31.    The JOLs shall not be required to give security for their appointment.

32.    The JOLs be authorised to exercise all of the following powers within and outside the Cayman Islands without further sanction of the Court, namely the powers:

   (a)    to bring or defend any action or other legal proceeding in the name and on behalf of the Fund either in their own name for and on behalf of the Fund, or in the name of the Fund on its behalf;

   (b)    to carry on the business of the Fund so far as may be necessary for its beneficial winding up;

   (c)    to dispose of any property of the Fund to a person who is or was related to the Fund;

   (d)    to pay any class of creditors in full;

   (e)    to make any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against the Fund or for which the Fund may be rendered liable;

(f)    to compromise on such terms as may be agreed all debts and liabilities capable of resulting in debts, and all claims (present or future, certain or contingent, ascertained or sounding only in damages) subsisting, or supposed to subsist between the Fund and a contributory or alleged contributory or other debtor or person apprehending liability to the Fund;

(g)    to deal with all questions in any way relating to or affecting the assets or the winding up of the Fund, to take any security for the discharge of any such call, debt, liability or claim and to give a complete discharge in respect of it;

(h)    to sell any of the Fund's property by public auction or private contract with power to transfer the whole of it to any person or to sell the same in parcels;

(i)    to raise or borrow money and grant security over the property of the Fund;

(j)    to engage staff (whether or not as employees of the Fund) to assist them in the performance of their functions;

(k)    to engage attorneys and other professionally qualified persons to assist them in the performance of their functions;

(l)    to take possession of, collect and get in the property of the Fund and for that purpose to take all such proceedings as they consider necessary;

(m)    to do all acts and execute, in the name and on behalf of the Fund, all deeds, receipts and other documents;

(n)    to prove, rank and claim in the bankruptcy, insolvency or sequestration of any contributory for any balance against his estate, and to receive dividends in the bankruptcy, insolvency or sequestration in respect of that balance, as a separate debt due from the bankrupt or insolvent and rateably with the other separate creditors;



(o)   to draw, accept, make and indorse any bill of exchange or promissory note in the name and on behalf of the Fund, with the same effect with the respect of the Fund's liability as if the bill or note had been drawn, accepted, made or indorsed by or on behalf of the Fund in the course of its business;

(p)   to convene meetings of creditors and contributories; and

(q)   to do all other things incidental to the exercise of their powers.

33.   The JOLs shall have the authority to appoint Cayman Islands attorneys, United States attorneys, and any other jurisdiction where the Fund has or may have assets, as they may consider necessary to advise and assist them in the performance of their duties and to remunerate them for their reasonable fees and expenses out of the assets of the Fund as an expense of the liquidation.

34.   The JOLs be at liberty to meet all disbursements reasonably incurred with the performance of their functions.

35.   The JOLs be at liberty to and do pay their agents, employees, attorneys, solicitors and whomsoever else they may employ or instruct, remuneration and costs, and for the avoidance of doubt, all such payments shall be made as and when they fall due out of the assets of the Fund as expenses of the winding up.

36.   No suit, action or other proceedings, including criminal proceedings, shall be proceeded with or commenced against the Fund except with leave of the Court pursuant to section 97 of the Law.

37.   No disposition of the Fund's property by or with the authority of the JOLs in the carrying out of their duties and functions and the exercise of their powers under this Order shall be avoided by virtue of section 99 of the Law.

38.   Any act required or authorised to be done by the JOLs may be done by any one of them.


**AND YOUR PETITIONER WILL EVER PRAY ETC:**


12596089.2 R0681.129522

DATED this ~~5~~ day of March 2015
FILED this        day of March 2015


_____
~~WALKERS~~
Attorneys at Law for the Petitioner


THIS petition was presented by Walkers Attorneys-at-Law of 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands for the JVLs, whose address for service is that of its said Attorneys-at-Law.


12596089.2 R0681.129522

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 00 OF 2015

IN THE MATTER OF SECTION 131 OF THE COMPANIES LAW (2013 REVISION)

AND IN THE MATTER OF MADISON NICHE OPPORTUNITIES FUND, LTD. (IN VOLUNTARY LIQUIDATION)

PETITION

TO: THE GRAND COURT

THE HUMBLE PETITION of **MATTHEW WRIGHT** and **CHRISTOPHER KENNEDY** of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, PO Box 897, Grand Cayman KY1-1103, Cayman Islands, as joint voluntary liquidators ("**JVLs**") of Madison Niche Opportunities Fund, Ltd. (in voluntary liquidation) (the "**Fund**") shows that:

### Incorporation

1.      The Fund is an exempted limited company and was incorporated under the laws of the Cayman Islands on 20 September 2002. Its registered office is c/o RHSW (Cayman) Limited, Windward 1, Regatta Office Park, PO Box 897, Grand Cayman KY1-1103, Cayman Islands.

2.      The Fund serves as a feeder fund for Madison Niche Opportunities Master Fund, Ltd (the "**Master Fund**"). The Master Fund is also in voluntary liquidation and the JVLs are appointed as its joint voluntary liquidators.

### Method by which the Fund was put into voluntary liquidation

3.      On 26 June 2014 the directors of the Fund passed a board resolution that its directors recommend to Madison Capital Advisors 1, LLC in its capacity as the sole voting shareholder of the Fund (the "**Voting Shareholder**") that it be wound up voluntarily and that the JVLs be appointed as its joint voluntary liquidators.

4.    Then, on 1 July 2014 the Voting Shareholder passed resolutions, as special written resolutions, that:

(a)    the business and affairs of the Fund be voluntarily wound up in accordance with section 116(c) of the Cayman Islands' Companies Law (2013 Revision) (the "**Law**"); and

(b)    the JVLs be appointed as the joint voluntary liquidators of the Fund.

5.    The JVLs filed consents to act as voluntary liquidators of the Fund with the Registrar of Companies on 1 July 2014.

6.    Special resolutions were also passed on 1 July 2014 to appoint the JVLs as joint voluntary liquidators of certain other members of the group to which the Fund belongs, being:

(a)    the Master Fund;

(b)    Madison Niche Assets Fund, Ltd ("**MNAF**"); and

(c)    Madison Niche Assets Master Fund, Ltd.

**Declaration of solvency**

7.    On 1 July 2014, the then directors of the Fund provided a signed declaration of solvency.

8.    Notwithstanding that a declaration of solvency was received, the JVLs are of the view that the winding up of the Fund under the supervision of the Court will result in a more effective, economic and expeditious liquidation of the Fund.

**Consent to appointment as Official Liquidators**

9.    The JVLs are qualified insolvency practitioners and consent to being appointed as Joint Official Liquidators of the Fund.

**Financial position of the Fund**

10.  The Fund is a feeder fund for the Master Fund and accordingly its sole asset is its shares in the Master Fund.

11.  The Fund holds 94.2% of the shares in the Master Fund. The remaining 5.8% of the shares in the Master Fund are held by Madison Niche Opportunities Fund, LLC (the **"Onshore Feeder Fund"**).

12.  The Fund therefore has an interest in the assets of the Master Fund after payment of other creditors in accordance with the Law and its financial position is dependent upon both the Master Fund's financial performance and the value of its assets.

13.  As of 4 March 2015, the Fund's assets are comprised by:

     (a)  cash of US$735,878.29 (subject to currency fluctuations);

     (b)  interests in the following investments, which are held via the Master Fund, and certain other intermediary holding companies:

          (i)   Madison Vineyard Holdings, LLC, in respect of which the Fund holds a 37.9% interest. This investment concerns the ownership and operation of a vineyard located in the Napa Valley, California and known as Jamieson Ranch. A recently conducted valuation values it between US$19,000,000 and US$30,000,000;

          (ii)  Madison Fort Lauderdale, LLC, in respect of which the Fund holds a 54.8% interest. This investment concerns the ownership of development-potential real estate located in Fort Lauderdale, Florida and known as Hampton Inn. The manager of this asset has valued it at between US$3,500,000 and US$5,400,000, although it is currently encumbered by bridging loan obligation, worth US$930,000;

          (iii) Red Mesa Holdings / O&G, LLC, in respect of which the Fund holds a 90.3% interest. This investment concerns the ownership

and operation of oil and gas drilling concerns located in La Plata County, Colorado ("**Red Mesa**"). Although this asset was valued at US$12,000,000 in its 30 September 2014 management accounts, it is expected to realise no value for the Fund, for the reasons explained below;

(iv)    United American Energy LLC, in respect of which the Fund holds an 88.8% interest. This investment concerns the ownership and operation of oil and gas drilling concerns located in Beattyville, Kentucky. Unaudited accounts as at 30 September 2014 valued this asset at US$14,300,000; and

(v)    Sagebrush Holdings / O&G, LLC in respect of which the Fund holds a 90.2% interest. This investment concerns the ownership and operation of oil and gas drilling concerns located in North Dakota. Although this asset was valued at US$2,700,000 in May 2014, it is currently expected to realise no value.

14.    As of 4 March 2015, current liabilities of the Fund are US$75,595.86, which are comprised principally by legal, insurance and some general operational expenses incurred by the underlying assets.

**The financial position of the Master Fund**

15.    As of 4 March 2015, the Master Fund holds cash totalling US$138,553.09 in addition to a small number of securities of minimal value. However, this financial position (and consequently, the financial position of the Fund) may be subject to significant change due to significant liabilities which continue to accrue against Red Mesa.

**Red Mesa**

16.    Red Mesa has underperformed due to the global decline in oil prices however its financial strife has been compounded due to recent intervention by the Colorado Oil and Gas Conservation Commission (the "**Regulator**"). The Regulator is responsible for promoting the responsible development of Colorado's oil and gas natural resources and is statutorily empowered to impose conditions, fines, levies

and/or restrictions which it considers necessary to prevent or mitigate any potentially adverse environmental impact that drilling entities such as Red Mesa might have.

17. It is expected that the recent closure of remaining oil wells at Red Mesa will result in further and significant increase in its financial obligations to the Regulator, such that it is now balance-sheet insolvent.

18. The JVLs have been advised by their United States legal advisors that the most prudent course of action is for Red Mesa to enter into bankruptcy pursuant to Chapter 7 of the United States Bankruptcy Code (the "**Code**").

**The bankruptcy of Red Mesa necessitates Court-supervised liquidation**

19. The entry by Red Mesa into bankruptcy, and the circumstances which precipitated it have necessitated the presentation of this petition: the JVLs are of the view that it is necessary to bring the liquidation of the Fund under the supervision of the Grand Court of the Cayman Islands (the "**Court**") because:

(a) recent escalating costs, the threat of regulatory intervention associated with Red Mesa, and the imminent engagement of a United States bankruptcy trustee have served to fundamentally change the nature of the liquidation of the Fund, such that voluntary liquidation is no longer appropriate and the well-established framework of Court-supervised liquidation is now a more suitable regime in which to conduct the liquidation;

(b) the threat of enforcement of fines and other penalties from the Regulator will be significantly reduced by the commencement of Court-supervised liquidation. This will provide the Fund and its investors with greater certainty by affording the JVLs (should they be appointed as joint official liquidators) the ability to complete the liquidation of the Fund without the ongoing threat of enforcement proceedings or other litigation;

(c) the JVLs' United States advisors have advised that there is a risk of the Regulator seeking to "pierce the corporate veil" when imposing financial sanctions. The JVLs therefore consider that it accords with their duty to

the creditors and investors of the Fund, to seek the protection of the Court against any attempts by the Regulator to encumber or diminish the other assets into which the Fund is invested; and

(d)     Red Mesa's United States advisors have advised that any bankruptcy trustee appointed pursuant to Chapter 7 of the Code would be more willing to deal with a Court-appointed liquidator.

**Court supervision will result in a more effective, economic and expeditious liquidation process**

20.    The JVLs also consider that the supervision of the Court will result in a more effective, economic and expeditious liquidation process. This is because a Court supervised process will:

(a)     allow them to carry out a comprehensive investigation into the Fund's affairs, including any claims that may vest in the Fund against any third parties, for the benefit of creditors;

(b)     assist in preventing any disposition of the Fund's property or the transfer of its shares or alteration in the status of the Fund's members unless by the order of the Court;

(c)     assist in the orderly distribution of the Fund's assets.

**Investor consent**

21.    The Fund's shareholders (the "**Investors**") are a dissimilar body ranging from household name institutional investors that hold over 15% of the issued share capital of the Fund, to minor investors holding less than 0.03% of the issued share capital of the Fund. On those occasions that the JVLs have written to the Investors some have responded, but many have not. The JVLs consider this is reflective of the quantum and disparate nature of the Investors.

22.    Accordingly, and in order to seek to establish a productive forum for Investor communication, the JVLs wrote to all investors of the Fund following their appointment and convened a meeting at which an informal liquidation committee

was appointed (the "**LC**"). The LC was appointed on 25 November 2014 and since its appointment the JVLs have had regular update calls with the LC, as well as ongoing ad-hoc communication with various of the LC members.

23.    Following the receipt of advice that Red Mesa was due to enter into bankruptcy, and that the Regulator may seek recourse against Fund assets beyond Red Mesa, the JVLs immediately contacted the LC and arranged a teleconference to provide an update: the teleconference took place on Friday 27 February 2015 and at it, the JVLs explained developments and the rationale behind their desire to move into Court-supervised liquidation.

24.    As at the date of this petition, all LC members have indicated that they support the Fund's entry into Court-supervised liquidation.

25.    On 2 March 2015 the JVLs also wrote to all investors of the Fund informing them that the JVLs intended to make an application for the liquidation of the Fund to be brought under the supervision of the Court. Given the urgency the JVLs requested that any Investor who opposed this petition provide notification of such opposition by midday (Cayman time) on Thursday 5 March 2015.

26.    As at the date of this petition, the JVLs have received no communication from any Investors indicating opposition, and as such the JVLs are of the view that no Investors oppose the petition. In the event that the JVLs receive any notification indicating disapproval between the date of this petition, and the date that the summons on this petition is heard, they will immediately inform the Court in writing. The JVLs will also provide all Investors with details of the date and time of the hearing of the summons on the petition, so that they can attend or be represented should they wish to.

**Conclusion**

27.    For the reasons set out above, the JVLs seek an order pursuant to section 131(b) of the Law that that the liquidation of the Fund continue under the supervision of the Court and that the JVLs be appointed as the joint official liquidators of the Fund.

**YOUR PETITIONER THEREFORE HUMBLY PRAYS THAT:**

28.   The liquidation of the Fund continue under the supervision of the Court.

29.   Matthew Wright and Christopher Kennedy of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, West Bay Road, Grand Cayman KY1-1103, Cayman Islands, be appointed as Joint Official Liquidators ("**JOLs**") of the Fund.

30.   The JOLs shall not be required to give security for their appointment.

31.   The JOLs be authorised to exercise all of the following powers within and outside the Cayman Islands without further sanction of the Court, namely the powers:

   (a)   to bring or defend any action or other legal proceeding in the name and on behalf of the Fund either in their own name for and on behalf of the Fund, or in the name of the Fund on its behalf;

   (b)   to carry on the business of the Fund so far as may be necessary for its beneficial winding up;

   (c)   to dispose of any property of the Fund to a person who is or was related to the Fund;

   (d)   to pay any class of creditors in full;

   (e)   to make any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against the Fund or for which the Fund may be rendered liable;

   (f)   to compromise on such terms as may be agreed all debts and liabilities capable of resulting in debts, and all claims (present or future, certain or contingent, ascertained or sounding only in damages) subsisting, or supposed to subsist between the Fund and a contributory or alleged contributory or other debtor or person apprehending liability to the Fund;

   (g)   to deal with all questions in any way relating to or affecting the assets or the winding up of the Fund, to take any security for the discharge of any

such call, debt, liability or claim and to give a complete discharge in respect of it;

(h)    to sell any of the Fund's property by public auction or private contract with power to transfer the whole of it to any person or to sell the same in parcels;

(i)    to raise or borrow money and grant security over the property of the Fund;

(j)    to engage staff (whether or not as employees of the Fund) to assist them in the performance of their functions;

(k)    to engage attorneys and other professionally qualified persons to assist them in the performance of their functions;

(l)    to take possession of, collect and get in the property of the Fund and for that purpose to take all such proceedings as they consider necessary;

(m)    to do all acts and execute, in the name and on behalf of the Fund, all deeds, receipts and other documents;

(n)    to prove, rank and claim in the bankruptcy, insolvency or sequestration of any contributory for any balance against his estate, and to receive dividends in the bankruptcy, insolvency or sequestration in respect of that balance, as a separate debt due from the bankrupt or insolvent and rateably with the other separate creditors;

(o)    to draw, accept, make and indorse any bill of exchange or promissory note in the name and on behalf of the Fund, with the same effect with the respect of the Fund's liability as if the bill or note had been drawn, accepted, made or indorsed by or on behalf of the Fund in the course of its business;

(p)    to convene meetings of creditors and contributories; and

(q)    to do all other things incidental to the exercise of their powers.

32.   The JOLs shall have the authority to appoint Cayman Islands attorneys, United States attorneys, and any other jurisdiction where the Fund has or may have assets, as they may consider necessary to advise and assist them in the performance of their duties and to remunerate them for their reasonable fees and expenses out of the assets of the Fund as an expense of the liquidation.

33.   The JOLs be at liberty to meet all disbursements reasonably incurred with the performance of their functions.

34.   The JOLs be at liberty to and do pay their agents, employees, attorneys, solicitors and whomsoever else they may employ or instruct, remuneration and costs, and for the avoidance of doubt, all such payments shall be made as and when they fall due out of the assets of the Fund as expenses of the winding up.

35.   No suit, action or other proceedings, including criminal proceedings, shall be proceeded with or commenced against the Fund except with leave of the Court pursuant to section 97 of the Law.

36.   No disposition of the Fund's property by or with the authority of the JOLs in the carrying out of their duties and functions and the exercise of their powers under this Order shall be avoided by virtue of section 99 of the Law.

37.   Any act required or authorised to be done by the JOLs may be done by any one of them.

**AND YOUR PETITIONER WILL EVER PRAY ETC:**

DATED this   _5_   day of March 2015

FILED this        day of March 2015

_____

**WALKERS**
Attorneys at Law for the Petitioner

THIS petition was presented by Walkers Attorneys-at-Law of 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands for the JVLs, whose address for service is that of its said Attorneys-at-Law.

## EXHIBIT B

**Supervision Orders**

#38099374_v1

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 0036 OF 2015 (ASCJ)

IN THE MATTER OF SECTION 131 OF THE COMPANIES LAW (2013 REVISION)

AND IN THE MATTER OF MADISON NICHE ASSETS FUND, LTD. (IN VOLUNTARY LIQUIDATION)

## SUPERVISION ORDER

**UPON** hearing counsel for Matthew Wright and Christopher Kennedy of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, West Bay Road, Grand Cayman KY1-1103, Cayman Islands in their capacities as joint voluntary liquidators of Madison Niche Assets Fund, Ltd. (in voluntary liquidation) (the "**JVLs**") (the "**Fund**") upon their petition dated 5 March 2015 for an order that the liquidation of the Fund continue under the supervision of the Court (the "**Petition**")

**AND UPON** reading the Petition, the First Affidavit of Matthew Wright sworn on 5 March 2015, the First Affidavit of Christopher Kennedy sworn on 5 March 2015, the Second Affidavit of Christopher Kennedy sworn on 5 March 2015, the Third Affidavit of Christopher Kennedy sworn on 5 March 2015 and the Forth Affidavit of Christopher Kennedy sworn on 10 March 2015

**AND UPON** the Court being satisfied that the JVLs are qualified insolvency practitioners

**IT IS ORDERED THAT**:

1.     The liquidation of the Fund continue under the supervision of the Court.

2.     Matthew Wright and Christopher Kennedy of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, West Bay Road, Grand Cayman KY1-1103, Cayman Islands, be appointed as Joint Official Liquidators ("**JOLs**") of the Fund.

3.     The JOLs shall not be required to give security for their appointment.

4.     The JOLs be authorised to exercise all of the following powers within and outside the Cayman Islands without further sanction of the Court, namely the powers:

1

(a)    to bring or defend any action or other legal proceeding in the name and on behalf of the Fund either in their own name for and on behalf of the Fund, or in the name of the Fund on its behalf;

(b)    to carry on the business of the Fund so far as may be necessary for its beneficial winding up;

(c)    to dispose of any property of the Fund to a person who is or was related to the Fund;

(d)    to pay any class of creditors in full;

(e)    to make any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against the Fund or for which the Fund may be rendered liable;

(f)    to compromise on such terms as may be agreed all debts and liabilities capable of resulting in debts, and all claims (present or future, certain or contingent, ascertained or sounding only in damages) subsisting, or supposed to subsist between the Fund and a contributory or alleged contributory or other debtor or person apprehending liability to the Fund;



(g)    to deal with all questions in any way relating to or affecting the assets or the winding up of the Fund, to take any security for the discharge of any such call, debt, liability or claim and to give a complete discharge in respect of it;

(h)    to sell any of the Fund's property by public auction or private contract with power to transfer the whole of it to any person or to sell the same in parcels;

(i)    to raise or borrow money and grant security over the property of the Fund;

(j)    to engage staff (whether or not as employees of the Fund) to assist them in the performance of their functions;

(k)    to engage attorneys and other professionally qualified persons to assist them in the performance of their functions;

(l)    to take possession of, collect and get in the property of the Fund and for that purpose to take all such proceedings as they consider necessary;

(m)    to do all acts and execute, in the name and on behalf of the Fund, all deeds, receipts and other documents;

(n)    to prove, rank and claim in the bankruptcy, insolvency or sequestration of any contributory for any balance against his estate, and to receive dividends in the bankruptcy, insolvency or sequestration in respect of that balance, as a separate debt due from the bankrupt or insolvent and rateably with the other separate creditors;

(o)    to draw, accept, make and indorse any bill of exchange or promissory note in the name and on behalf of the Fund, with the same effect with the respect of the Fund's liability as if the bill or note had been drawn, accepted, made or indorsed by or on behalf of the Fund in the course of its business;

(p)    to convene meetings of creditors and contributories;

(q)    to do all other things incidental to the exercise of their powers; and

(r)    to enter into co-operation agreements with a trustee-in-bankruptcy.

5.    The JOLs shall have the authority to appoint Cayman Islands attorneys, United States attorneys, and any other jurisdiction where the Fund has or may have assets, as they may consider necessary to advise and assist them in the performance of their duties and to remunerate them for their reasonable fees and expenses out of the assets of the Fund as an expense of the liquidation.

6.    The JOLs be at liberty to meet all disbursements reasonably incurred with the performance of their functions.

7.    The JOLs be at liberty to and do pay their agents, employees, attorneys, solicitors and whomsoever else they may employ or instruct, remuneration and costs, and for the avoidance of doubt, all such payments shall be made as and when they fall due out of the assets of the Fund as expenses of the winding up.

3

8.  No suit, action or other proceedings, including criminal proceedings, shall be proceeded with or commenced against the Fund except with leave of the Court pursuant to section 97 of the Companies Law of the Cayman Islands (the "**Law**").

9.  No disposition of the Fund's property by or with the authority of the JOLs in the carrying out of their duties and functions and the exercise of their powers under this Order shall be avoided by virtue of section 99 of the Law.

10. Any act required or authorised to be done by the JOLs may be done by any one of them.

DATED the *11* day of *March* 2015

FILED the *12* day of *March* 2015



**The Honourable Judge of the Grand Court**

THIS ORDER was filed by Walkers, Attorneys at Law for the JVLs whose address for service is that of their said attorneys, at 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands.

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 0035 OF 2015 (ASCJ)**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES LAW (2013 REVISION)**

**AND IN THE MATTER OF MADISON NICHE OPPORTUNITIES FUND, LTD. (IN VOLUNTARY LIQUIDATION)**

## SUPERVISION ORDER

**UPON** hearing counsel for Matthew Wright and Christopher Kennedy of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, West Bay Road, Grand Cayman KY1-1103, Cayman Islands in their capacities as joint voluntary liquidators of Madison Niche Opportunities Fund, Ltd. (in voluntary liquidation) (the "**JVLs**") (the "**Fund**") upon their petition dated 5 March 2015 for an order that the liquidation of the Fund continue under the supervision of the Court (the "**Petition**")

**AND UPON** reading the Petition, the First Affidavit of Matthew Wright sworn on 5 March 2015, the First Affidavit of Christopher Kennedy sworn on 5 March 2015, the Second Affidavit of Christopher Kennedy sworn on 5 March 2015, the Third Affidavit of Christopher Kennedy sworn on 5 March 2015 and the Forth Affidavit of Christopher Kennedy sworn on 10 March 2015

**AND UPON** the Court being satisfied that the JVLs are qualified insolvency practitioners

**IT IS ORDERED THAT**:

1. The liquidation of the Fund continue under the supervision of the Court.

2. Matthew Wright and Christopher Kennedy of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, West Bay Road, Grand Cayman KY1-1103, Cayman Islands, be appointed as Joint Official Liquidators ("**JOLs**") of the Fund.

3. The JOLs shall not be required to give security for their appointment.

1

4.      The JOLs be authorised to exercise all of the following powers within and outside the Cayman Islands without further sanction of the Court, namely the powers:

(a)      to bring or defend any action or other legal proceeding in the name and on behalf of the Fund either in their own name for and on behalf of the Fund, or in the name of the Fund on its behalf;

(b)      to carry on the business of the Fund so far as may be necessary for its beneficial winding up;

(c)      to dispose of any property of the Fund to a person who is or was related to the Fund;

(d)      to pay any class of creditors in full;

(e)      to make any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against the Fund or for which the Fund may be rendered liable;

(f)      to compromise on such terms as may be agreed all debts and liabilities capable of resulting in debts, and all claims (present or future, certain or contingent, ascertained or sounding only in damages) subsisting, or supposed to subsist between the Fund and a contributory or alleged contributory or other debtor or person apprehending liability to the Fund;

(g)      to deal with all questions in any way relating to or affecting the assets or the winding up of the Fund, to take any security for the discharge of any such call, debt, liability or claim and to give a complete discharge in respect of it;

(h)      to sell any of the Fund's property by public auction or private contract with power to transfer the whole of it to any person or to sell the same in parcels;

(i)      to raise or borrow money and grant security over the property of the Fund;

(j)      to engage staff (whether or not as employees of the Fund) to assist them in the performance of their functions;

2

(k)     to engage attorneys and other professionally qualified persons to assist them in the performance of their functions;

(l)     to take possession of, collect and get in the property of the Fund and for that purpose to take all such proceedings as they consider necessary;

(m)     to do all acts and execute, in the name and on behalf of the Fund, all deeds, receipts and other documents;

(n)     to prove, rank and claim in the bankruptcy, insolvency or sequestration of any contributory for any balance against his estate, and to receive dividends in the bankruptcy, insolvency or sequestration in respect of that balance, as a separate debt due from the bankrupt or insolvent and rateably with the other separate creditors;

(o)     to draw, accept, make and indorse any bill of exchange or promissory note in the name and on behalf of the Fund, with the same effect with the respect of the Fund's liability as if the bill or note had been drawn, accepted, made or indorsed by or on behalf of the Fund in the course of its business;

(p)     to convene meetings of creditors and contributories;

(q)     to do all other things incidental to the exercise of their powers; and

(r)     to enter into co-operation agreements with a trustee-in-bankruptcy.

5.     The JOLs shall have the authority to appoint Cayman Islands attorneys, United States attorneys, and any other jurisdiction where the Fund has or may have assets, as they may consider necessary to advise and assist them in the performance of their duties and to remunerate them for their reasonable fees and expenses out of the assets of the Fund as an expense of the liquidation.

6.     The JOLs be at liberty to meet all disbursements reasonably incurred with the performance of their functions.

7.     The JOLs be at liberty to and do pay their agents, employees, attorneys, solicitors and whomsoever else they may employ or instruct, remuneration and costs, and for the

3

avoidance of doubt, all such payments shall be made as and when they fall due out of the assets of the Fund as expenses of the winding up.

8.    No suit, action or other proceedings, including criminal proceedings, shall be proceeded with or commenced against the Fund except with leave of the Court pursuant to section 97 of the Companies Law of the Cayman Islands (the "**Law**").

9.    No disposition of the Fund's property by or with the authority of the JOLs in the carrying out of their duties and functions and the exercise of their powers under this Order shall be avoided by virtue of section 99 of the Law.

10.   Any act required or authorised to be done by the JOLs may be done by any one of them.

DATED the _11_ day of _March_ 2015

FILED the _12_ day of _March_ 2015

**The Honourable Judge of the Grand Court**

THIS ORDER was filed by Walkers, Attorneys at Law for the JVLs whose address for service is that of their said attorneys, at 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands.



5

## EXHIBIT C

**Consulting Agreement**

#38099374_v1

# AMENDED AND RESTATED

# CONSULTING AGREEMENT

THIS AMENDED AND RESTATED CONSULTING AGREEMENT is made and entered into as of October 15, 2014, pursuant to Section 10 of that certain Consulting Agreement dated July 1, 2014, by and between (i) MATTHEW WRIGHT and CHRISTOPHER KENNEDY of RHSW (Cayman) Limited ("**RHSW**"), the Joint Voluntary Liquidators (collectively, the "**Liquidators**") of the funds (each a "**Fund**", and collectively the "**Funds**") and their respective operating companies (each an "**Operating Company**", and collectively the "**Operating Companies**") set forth in Exhibit A hereto, (ii) TMC CONSULTING SERVICES, LLC, a Delaware limited liability company (the "**Consultant**"), and (iii) each of the Funds.

## Recitals

WHEREAS, the voting ordinary shareholders and managers, as applicable, of each of the Funds have determined that it is necessary to commence, as of July 1, 2014 (the "**Start Date**"), the formal liquidation of their respective Funds and remaining Fund assets, including the Operating Companies (collectively, the "**Liquidation**"), and have engaged the LIQUIDATORS as Joint Voluntary Liquidators (or similar officers) to the Liquidation;

WHEREAS, the CONSULTANT, whether directly or through personnel, has experience managing funds and their assets (including operating companies); and

WHEREAS, the LIQUIDATORS desire to engage the CONSULTANT to provide certain consulting services with respect to the Funds and Operating Companies to facilitate the Liquidation process; provided that under no circumstances will the CONSULTANT be providing any investment advice regarding securities and all decisions regarding the custody and disposition of the assets of the Funds will remain in LIQUIDATORS sole discretion.

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

## Agreement

1. **Engagement of the CONSULTANT.**

(a)     Subject to the oversight, supervision, decision making, custody of assets and control of the LIQUIDATORS, the LIQUIDATORS hereby engage the CONSULTANT to provide, and the CONSULTANT agrees to provide, beginning as of the Start Date, those consulting services with respect to the Funds and the Operating Companies set forth on Exhibit B on the terms and conditions set forth in this Agreement, and the CONSULTANT hereby accepts such appointment and agrees to perform such services. The duties or other obligations of the CONSULTANT to the LIQUIDATORS, the Funds and Operating Companies shall be confined to those matters expressly set forth herein, and no implied duties or other obligations are assumed by or may be asserted against the CONSULTANT hereunder.  It is expressly agreed that CONSULTANTS will not be provided any advice to the LIQUIDATORS regarding securities, and all assets of the Funds shall,

until their disposal, be in the exclusive, sole and complete custody and control of the LIQUIDATORS.

(b)     CONSULTANT will solely be responsible for the selection of resources to perform the consulting services and duties set forth herein.   For the avoidance of doubt, to the extent that the CONSULTANT determines that the engagement of any further third party service providers, including, without limitation, property management companies, vendors or other consultants, is either necessary or desirable in order to allow it to deliver the services contemplated hereby, then the LIQUIDATORS agree to cause such additional service providers to be engaged directly by the Funds, and the CONSULTANT shall have no legal, regulatory, financial or other liability with respect to such contracts. However, prior to the engagement of any third party service providers directly by a Fund (but not third party service providers engaged by an Operating Company), the CONSULTANT will inform the LIQUIDATORS and provide a copy of the proposed engagement contract to the LIQUIDATORS. The LIQUIDATORS shall have authority to review and shall review and revise any such contract prior to its signing. Should it not prove possible to agree acceptable terms with the service provider, the LIQUIDATORS will not be required to cause the Funds to engage them.  For the avoidance of doubt, any engagement contract to be entered into with a third party service party directly by an Operating Company shall not be subject to the foregoing review process.

## 2.     **Compensation**

(a)     The LIQUIDATORS agree to cause the Funds to pay, and the Funds shall pay, the CONSULTANT an aggregate monthly fee for the consulting services provided hereunder (the "***Monthly Fee***").  The Monthly Fee will be composed of two components: (i) a flat monthly fee of $70,833 US Dollars ("***USD***") for consulting services for the Funds, and (ii) an adjustable monthly fee for consulting services for the Operating Companies which will start at USD $634,312 – resulting in an initial aggregate Monthly Fee of USD $705,145.  The adjustable component of the Monthly Fee shall be reduced from time to time as provided in Exhibit C in connection with the liquidation of an Operating Company in the month following the full liquidation of such Operating Company; provided, however, that in no event shall the aggregate Monthly Fee for any month be less than USD $100,000.

(b)     The Monthly Fee shall be paid to the CONSULTANT in advance by no later than the 1st calendar day of the month in which the services shall be performed.  The first payment due date will be the Start Date.  Late payments shall incur a late payment fee of 1.5% per month of any Monthly Fee received after the payment due date.  For the avoidance of doubt, in the event that this Agreement is terminated pursuant to Section 9(c), the Liquidators and the Funds will have no further obligation to pay the Monthly Fee.

(c)     Notwithstanding the foregoing, in the event that, due to unforeseen circumstances or additional service requests by the LIQUIDATORS outside the contemplated scope of services, the CONSULTANT anticipates that the Monthly Fee will not cover its expenses for any calendar month, then (i) the CONSULTANT shall provide the LIQUIDATORS with written notice of such determination (which notice shall include information reasonably detailing the basis for such determination) not later than 10 business days prior to the next payment due date, and (ii) the CONSULTANT shall not be obligated to perform any services which would cause its expenses to exceed the Monthly Fee until such time as the CONSULTANT and the LIQUIDATORS have agreed to a mutually acceptable compensation amount for the month.

(d)     The CONSULTANT may from time to time, with the prior consent of the LIQUIDATORS, elect to defer all or a portion of its Monthly Fee for any period of time, provided that such deferral becomes immediately due and payable upon the request of the CONSULTANT. Any deferred balance shall accrue interest at a rate equal to the prime rate as periodically published in the Wall Street Journal plus 3.0%.  Interest shall be calculated for the actual number of days elapsed on the basis of a 360-day year.  Any payments received shall first be applied to the outstanding interest balance, and then applied to the outstanding deferred amount.

**3.     Representations and Warranties**

(a)     Each LIQUIDATOR hereby represents and warrants to the CONSULTANT, which representations and warranties shall be deemed to be continuing throughout the term of this Agreement, that:

(i)     Such person is duly organized and existing under the laws of the jurisdiction of its organization, to the extent applicable, with full power to carry on his or its business as now conducted, to enter into this Agreement and to perform its obligations hereunder;

(ii)     This Agreement has been duly authorized, executed and delivered by such person in accordance with all requisite action and constitutes a valid and legally binding obligation of thereof, enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, sequestration and other laws of general application affecting the rights and remedies of creditors and secured parties; and

(iii)     Such person is conducting its business in compliance in all material respects with all applicable laws and regulations and has obtained all regulatory approvals necessary to carry on its business as now conducted; there is no statute, rule, regulation, order or judgment binding on it and no provision of its charter, bylaws or any contract binding it or affecting its property which would prohibit its execution or performance of this Agreement.

(b)     The CONSULTANT hereby represents and warrants to the LIQUIDATORS, which representations and warranties shall be deemed to be continuing throughout the term of this Agreement, that:

(i)     It is duly organized and existing under the laws of the jurisdiction of its organization, with full power to carry on its business as now conducted, to enter into this Agreement and to perform its obligations hereunder;

(ii)     This Agreement has been duly authorized, executed and delivered by the CONSULTANT in accordance with all requisite action and constitutes a valid and legally binding obligation of the CONSULTANT, enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, sequestration and other laws of general application affecting the rights and remedies of creditors and secured parties; and

(iii)     It is conducting its business in compliance in all material respects with all applicable laws and regulations and has obtained all regulatory approvals necessary to carry on its business as now conducted; there is no statute, rule, regulation, order or judgment

binding on it and no provision of its charter, bylaws or any contract binding it or affecting its property which would prohibit its execution or performance of this Agreement.

**4.**     **Standard of Care; Indemnification; Limitation of Liability.**

(a)     The CONSULTANT shall exercise reasonable care in the performance of its duties under this Agreement, but shall not be liable for any error of judgment or mistake of law or for any loss suffered by the LIQUIDATORS or the Funds or Operating Companies in connection with its duties under this Agreement, except for losses arising out of or relating to (i) a breach of the terms of this Agreement by the CONSULTANT, or (ii) from the CONSULTANT's bad faith, gross negligence, or willful misconduct in the performance of this Agreement.

(b)     Notwithstanding any other provision of this Agreement, the LIQUIDATORS shall cause the Funds to indemnify and hold harmless, and the Funds will indemnify and hold harmless, the CONSULTANT from and against any and all claims, demands, losses, expenses, and liabilities of any and every nature (including reasonable attorneys' fees) that the CONSULTANT may (i) sustain or incur, or (ii) that may be asserted against the CONSULTANT by any person arising out of any action taken or omitted to be taken by it, in each case, in performing the services hereunder, except for any and all claims, demands, losses, expenses, and liabilities arising out of or relating to the CONSULTANT's breach of the terms of this Agreement or from its bad faith, gross negligence or willful misconduct in the performance of this Agreement. This indemnity shall be a continuing obligation of the Funds and their successors and assigns, notwithstanding the termination of this Agreement. To the extent that any services requested by the LIQUIDATORS to be provided by the CONSULTANT are not covered under the indemnification provided by the Funds, then the CONSULTANT shall not be obligated to perform any such services until the CONSULTANT has been provided with indemnification therefore satisfactory to the CONSULTANT. As used in this paragraph, the term "CONSULTANT" shall include the CONSULTANT's principals, members, managers, shareholders, appropriate related entities and their respective directors, officers and employees.

(c)     Further, with prior agreement with the LIQUIDATORS, the LIQUIDATORS shall cause the Funds to reimburse, and the Funds shall reimburse, the CONSULTANT for any actual insurance costs incurred by the CONSULTANT in connection with provision by the CONSULTANT of the services contemplated by this Agreement up to a maximum aggregate amount not to exceed an annual amount of US$200,000.00.

(d)     Neither party to this Agreement shall be liable to the other party for incidental, consequential, exemplary special or punitive damages under any provision of this Agreement.

(c)     In order that the indemnification provisions contained in this section shall apply, it is understood that if in any case the indemnitor may be asked to indemnify or hold the indemnitee harmless, the indemnitor shall be fully and promptly advised of all pertinent facts concerning the situation in question, and it is further understood that the indemnitee will use all reasonable care to notify the indemnitor promptly concerning any situation that presents or appears likely to present the probability of a claim for indemnification. The indemnitor shall have the option to defend the indemnitee against any claim that may be the subject of this indemnification. In the event that the indemnitor so elects, it will so notify the indemnitee and thereupon the indemnitor shall take over complete defense of the claim, and the indemnitee shall in such situation initiate no further legal or other expenses for which it shall seek indemnification under this section. The indemnitee shall in no

case confess any claim or make any compromise in any case in which the indemnitor will be asked to indemnify the indemnitee except with the indemnitor's prior written consent.

(f)     The indemnity and defense provisions set forth in this Section 4 shall indefinitely survive the termination and/or assignment of this Agreement.


**5.      Provision of Data and Reporting.**

(a)     The LIQUIDATORS shall cause to be furnished to the CONSULTANT from time to time such data as the CONSULTANT may reasonably request in order to perform the services described herein at such times and in such form as mutually agreed upon.

(b)     The CONSULTANT shall cause to be furnished to the LIQUIDATORS from time to time such reporting and other information as the LIQUIDATORS reasonably request on behalf of the Funds or Operating Companies in connection with the CONSULTANT'S performance of the services at such times and in such form as mutually agreed upon.

**6.      Proprietary and Confidential Information.**

(a)     The CONSULTANT agrees on behalf of itself and its principals, members, managers, shareholders, affiliates and their respective directors, officers and employees to treat confidentially and as proprietary information all records and other information relative to the LIQUIDATORS and the Funds and Operating Companies and not to use such records and information for any purpose other than the performance of its responsibilities and duties hereunder, except (i) after prior written notification to the LIQUIDATORS, when requested to divulge such information by duly constituted authorities, or (ii) when so requested by the LIQUIDATORS. Records and other information which have become known to the public through no wrongful act of the CONSULTANT or any of its employees, agents or representatives shall not be subject to this paragraph.

(b)     The CONSULTANT will adhere to the privacy policies adopted by the LIQUIDATORS as may be modified from time to time. In this regard, the CONSULTANT shall have in place and maintain physical, electronic and procedural safeguards reasonably designed to protect the security, confidentiality and integrity of, and to prevent unauthorized access to or use of, records and information relating to LIQUIDATORS and the Funds and Operating Companies.

**7.      Records.**  During the period commencing on the Start Date and ending upon the termination of this Agreement, the CONSULTANT shall keep records relating to the services to be performed hereunder in the form and manner as it may deem advisable and is reasonably agreeable to the LIQUIDATORS.  The CONSULTANT agrees that all such records prepared or maintained by the CONSULTANT relating to the services to be performed by the CONSULTANT hereunder are the property of LIQUIDATORS and will be promptly surrendered to the LIQUIDATORS or their designee on and in accordance with their request.  Any record retention by the CONSULTANT following the termination of this Agreement shall be on such terms and conditions as may be agreed by the CONSULTANT and the LIQUIDATORS in their discretion.

**8.      Compliance with Laws.**     The LIQUIDATORS have and retain responsibility for all regulatory and other compliance matters relating to the Funds and/or Operating Companies.  The

CONSULTANT's services hereunder shall not relieve LIQUIDATORS of their responsibilities for assuring such compliance.

**9.**     **Term of Agreement; Termination.**

    (a)     The initial term of this Agreement shall become effective as of the Start Date and will continue in effect until December 31, 2015.

    (b)     Following the initial term, this Agreement shall continue in effect from year-to-year unless terminated by either party upon giving 120 days prior written notice to the other party or such shorter period as is mutually agreed upon by the parties.

    (c)     Notwithstanding the foregoing, this Agreement may be earlier terminated as follows: (i) by either the LIQUIDATORS or the CONSULTANT (A) upon the breach of this Agreement by another party if such breach is not cured within 30 calendar days of written notice of such breach to the breaching party, or (B) the final dissolution of all of the Funds, (ii) by the LIQUIDATORS upon 30 calendar days notice to the CONSULTANT if the LIQUIDATORS' office as liquidators (or similar officers) to each of the Funds shall cease, or (iii) automatically without further action by any party, in the event that one or more parties other than the Liquidators are appointed as the Joint Voluntary Liquidators (or similar officers) to the Funds.

**10.**     **Amendment.**   This Agreement may not be amended or modified in any manner except by written agreement executed by the CONSULTANT and LIQUIDATORS.

**11.**     **Duties in the Event of Termination.**   In the event that, in connection with termination of this Agreement, a successor to any of the CONSULTANT's duties or responsibilities hereunder is designated by LIQUIDATORS by written notice to the CONSULTANT, the CONSULTANT will promptly, upon such termination and at the expense of the Funds, transfer to such successor all relevant books, records, files, correspondence, and other data established or maintained by the CONSULTANT under this Agreement in a form reasonably acceptable to LIQUIDATORS (if such form differs from the form in which the CONSULTANT has maintained the same, the Funds shall pay any expenses associated with transferring the data to such form), and will cooperate in the transfer of such duties and responsibilities, including provision for assistance from the CONSULTANT's personnel in the establishment of books, records, files and other data by such successor. If no such successor is designated, then such books, records, files and other data shall be returned to LIQUIDATORS. The provisions of Section 2 (Compensation), Section 4, (Standard of Care; Indemnification; Limitation of Liability), Section 6 (Proprietary and Confidential Information), and Section 13 (Governing Law) shall survive any termination of this Agreement.

**12.**     **Assignment.**   This Agreement shall extend to and be binding upon the parties hereto and their respective successors and assigns; provided, however, that this Agreement shall not be assignable by LIQUIDATORS without the prior written consent of the CONSULTANT, or by the CONSULTANT without the prior written consent of LIQUIDATORS.

**13.**     **Governing Law.**   This Agreement shall be construed, enforced in and governed by the laws of the State of Delaware without regard to principals of conflict of laws to the extent that such principles would cause the laws of any other jurisdiction to apply. Venue shall be confined to any Delaware State court or Federal court sitting in the State of Delaware.

**14.** **No Agency Relationship.** Nothing herein contained shall be deemed to authorize or empower any party to act as agent for another party to this Agreement, or to conduct business in the name, or for the account, of the other party to this Agreement.

**15.** **Proprietary and Confidential Information.** Nothing in this Agreement shall limit or restrict either party from providing services to other parties that are similar or identical to some or all of the services provided hereunder.

**16.** **Invalidity.** Any provision of this Agreement which may be determined by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. In such case, the parties shall in good faith modify or substitute such provision consistent with the original intent of the parties.

**17.** **Legal Related Services.** Nothing in this Agreement shall be deemed to appoint the CONSULTANT and its principals, members, managers, shareholders, affiliates and their respective directors, officers and employees as the Funds' attorneys, form attorney-client relationships or require the provision of legal advice. LIQUIDATORS acknowledge that in-house attorneys represent the CONSULTANT and rely on outside counsel retained by LIQUIDATORS to review all services provided by in-house attorneys for the CONSULTANT and to provide independent judgment on the Funds' behalf.

**19.** **Notices.** Any notice required or permitted to be given by either party to the other shall be in writing and shall be deemed to have been given on the date delivered personally or by courier service, or three days after sent by registered or certified mail, postage prepaid, return receipt requested, or on the date sent and confirmed received by facsimile or email transmission to the other party's address set forth below:

Notice to the CONSULTANT shall be sent to:

> TMC Consulting Services, LLC
> 5619 DTC Parkway, Suite 800
> Greenwood Village, Colorado  80111
> Attn: Robert Walker

Notice to LIQUIDATORS and the Funds shall be sent to them:

> c/o RHSW (Cayman) Limited
> Windward 1 Regatta Office Park
> P.O. Box 897
> Grand Cayman, KY1-1103
> Cayman Islands
> Attn: Matthew Wright and Christopher Kennedy
> Email to: Matthew.Wright@rawlinson-hunter.com.ky
> Chris.Kennedy@rawlinson-hunter.com.ky

**20.** <u>**Multiple Originals.**</u>  This Agreement may be executed on two or more counterparts, each of which when so executed shall be deemed to be an original, but such counterparts shall together constitute but one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by a duly authorized signatory on one or more counterparts as of the date first above written.

**Liquidators**

**MATTHEW WRIGHT**

_____

**CHRISTOPHER KENNEDY**

_____

**Funds**

**MADISON NICHE OPPORTUNITIES FUND, LTD.**

**MADISON NICHE OPPORTUNITIES FUND, LLC**

**MADISON NICHE OPPORTUNITIES MASTER FUND, LTD.**

**MADISON NICHE ASSETS FUND, LTD.**

**MADISON NICHE ASSETS FUND, LLC**

**MADISON NICHE ASSETS MASTER FUND, LTD.**

By: _____
Name: Matthew Wright
Title: Joint Voluntary Liquidator

By: _____
Name: Christopher Kennedy
Title: Joint Voluntary Liquidator

**Consultant**

**TMC CONSULTING SERVICES, LLC**

By: _____
Name:
Title:

## EXHIBIT A

### Funds

1.  Madison Niche Opportunities Fund, Ltd. (a Cayman Islands exempted limited liability company)

2.  Madison Niche Opportunities Fund, LLC (a Delaware limited liability company)

3.  Madison Niche Opportunities Master Fund, Ltd. (a Cayman Islands exempted limited liability company)

4.  Madison Niche Assets Fund, Ltd. (a Cayman Islands exempted limited liability company)

5.  Madison Niche Assets Fund, LLC (a Delaware limited liability company)

6.  Madison Niche Assets Master Fund, Ltd. (a Cayman Islands exempted limited liability company)

### Operating Companies

1.  Madison Fort Lauderdale, LLC (for the Fund asset: Hampton Inn and Suites Ft. Lauderdale Marina)

2.  Madison Vineyard Holdings, LLC (for the Fund asset: Reata (d/b/a Jamieson Ranch and Vineyards))

3.  Red Mesa Holdings/O&G, LLC (for the Fund asset: Red Mesa Holdings/O&G, LLC)

4.  United American Energy, LLC (for the Fund asset: United American Energy, LLC)

5.  Sagebrush Holdings/O&G, LLC (for the Fund asset: Sagebrush Holdings/O&G, LLC)

6.  MRAH, LLC (for the Fund asset: Rich Albany Hotel, LLC)

# EXHIBIT B

## List of Representative Services

*The following list of representative services is only a selective list of the services which the Consultant currently anticipates are or may be material to the Funds and Operating Companies. This list is not intended to be an exhaustive list of all services which may be required or desirable nor will each service be performed for each Fund or Operating Company, as each of the Funds and the Operating Companies have their own unique requirements; provided, however, in no event shall the CONSULTANT provide investment advice or have custody or control over any assets of the Funds.*

1. **Funds and Operating Companies Services:** Provide on-going and regular oversight of the daily and/or weekly operations of the Funds and the Operating Companies.

   a. **Business Planning for Monetization Events:** Determine work needed to prepare assets for sale when determined by the LIQUIDATORS, and execute and monitor that work, including strategic business planning and forecasting financial performance and projections, and the monitoring of such activities daily, weekly, monthly, quarterly, annually or as needed. Business planning shall not include any recommendation to the Liquidators on the timing of an asset sale, the price at which an asset shall be sold, or the retention of an asset.

   b. **Annual Budgets:** Development of annual capital and operating budgets for the Funds and Operating Companies.

   c. **Operating Company Level Debt:** Monitoring and helping the LIQUIDATORS to obtain any and all financings for the purpose of funding, directly or indirectly, all or a portion of the cost of holding, owning, improving, remodeling, renovating, redeveloping, operating, maintaining, managing, leasing, exchanging and/or disposing of all or any portion of assets and any assumption, replacement, renewal, extension, addition supplemental modification, amendment or refinancing thereof.

   d. **Operating Company Property Construction or Repair:** Development and oversight of any real property improvement plan in order to improve, remodel, renovate, redevelop, maintain, lease, or dispose of the property as well as any necessary due diligence, selection, engagement and oversight of any consultants or third party servicer provider.

   e. **Fund and Operating Company Third-party Service Providers:** Selection of any real property management company, vendors, consultants and third-party service providers, as deemed appropriate, as well as any necessary due diligence, selection, engagement and oversight of any consultants or third party servicer provider.

   f. **Operating Company Human Resource Services:** Provide human resource services, as applicable, for general oversight of employees, hiring/termination of employee's, payroll processing (weekly and bi-monthly processing), implementation and monitoring of benefits and other related human resource activities.

   g. **Fund and Operating Company Information Technology Services:** Provide information technology services, as applicable, for general oversight and

11

communications. Monitor systems against vulnerability to damage or interruption from power loss, telecommunications failures, computer viruses, break-ins and similar events.

h. **Fund and Operating Company Risk Management and Insurance Requirement:** Implement and manage the overall risk mitigation and insurance program, based on the identified risks of the Operating Companies, onsite risk mitigation meetings/training, recommending coverage types, and deductibles, as well as manage any applicable claim settlement.

i. **Operating Company State and Federal Regulatory Requirements:** Monitor and manage material applicable State and Federal regulatory agency requirements for operating companies, such as environmental considerations or liquor regulations/licenses.

j. **Fund and Operating Company Legal/Litigation Matters:** Monitor and manage legal matters, including the selection of external counsel.

k. **Operating Company Monetization Events:** At the direction of the LIQUIDATORS, provide comprehensive due diligence on potential brokers/investment bankers, the related marketing materials, marketing strategy. Selection of buyers and/or investors will be at the sole discretion of the LIQUIDATORS. Negotiation of purchase and sale agreement and closing processes will be performed at the direction and under the control and authority of the LIQUIDATORS.

2. **Cash Management Services**

a. Facilitate all cash transactions on behalf of the Operating Companies, including the payment of Operating Company expenses, cash needs of the Operating Companies, and collection of Operating Company revenue and any applicable distributions.

b. As directed and approved by the LIQUIDATORS, facilitate all cash transactions on behalf of the Funds, including: executing daily cash transfer services, either via wire, book transfer, ACH or checks and the collection of any applicable distributions from its investments.

c. Provide monthly, quarterly and/or annual cash flow information for the Funds and Operating Companies, as requested.

d. Maintain a daily transaction record for the LIQUIDATORS regarding all Fund and Operating Companies cash transactions.

e. Perform monthly bank account reconciliations for the LIQUIDATORS regarding all Funds and Operating Companies.

f. Execute any required bank account activities (opening, closing and regulatory compliance as required by banks), as directed and approved by the LIQUIDATORS.

g. Revise bank account access and cash management processes to include LIQUIDATORS as authorized signors to the applicable bank accounts

3. **Accounting Services**

a. Preparing and posting daily, weekly, monthly and quarterly G/L activity

b. Maintain updated accounting records for Funds and Operating Companies, including recording necessary financial activity, prepaid, accruals and other applicable entries to comply with U.S. GAAP

c. Prepare monthly financial reports of the Funds for LIQUIDATORS

d. Prepare monthly, quarterly and annual financial statements for the Operating Companies, including any lender/borrower required financial reporting

e. Maintain appropriate books and records retention

f. Prepare budget to actual reporting, in connection with the financial reporting outlined in 3.c. and 3.d. above

g. Processing accounts payable as needed, and generally performed on a two week payment cycle for the Funds and Operating Companies. This includes payments via check, wire, ACH or other means, as directed and approved by the LIQUIDATORS.

## 4. Tax Compliance Services

a. Maintain a tax calendar, which includes the required tax forms and due dates to maintain compliance with applicable regulations

b. Complete internal tax returns to facilitate the completion of Fund and investor tax returns.

c. Manage the oversight of the third-party tax compliance service provider as needed, (including daily or weekly oversight) for the completion of the annual Form K-1s for the Funds and Operating Companies, as applicable

d. Computation of monthly, quarterly and annual tax estimates, as deemed necessary

e. Preparing annual, quarterly and monthly property and sales tax returns, as necessary

f. Filing any additional annual, quarterly or monthly tax returns, as required

## 5. Investor Reporting and Communication

a. Assist in the investor file transition from Administrator to LIQUIDATORS

b. Assist in responses to investor inquiries, as directed by LIQUIDATORS. Such assistance shall not include any advice or recommendations to fund investors on any potential sale or transfer of their interest in a Fund or the value of their interests in a Fund or any securities, distributed to an investor in connection with a monetization event or otherwise.

c. Provide necessary information to assist LIQUIDATORS in their semi-annual/annual investor reporting; provided that the CONSULTANT shall not include any recommendation to the Liquidators or the fund investors on the timing of an asset sale, the price at which an asset shall be sold, or the retention of an asset.

d. Provide reasonable assistance to LIQUIDATORS relating to other fund investor requests/information

## EXHIBIT C

### Initial Monthly Fee Schedule

|  | Monthly |
|---|---|
| Fund Consulting Costs[1] | $ 70,833 |
| Operating Company Costs[1,2] | 634,312 |
| **Total Monthly Cost[3]** | **$ 705,145** |

### Monthly Fee Adjustment for Operating Companies Liquidation [2]

|  | Reduction % of Total Operating Company Cost |
|---|---|
| Madison Fort Lauderdale, LLC | 20.0% |
| Madison Vineyard Holdings, LLC | 40.0% |
| Red Mesa Holdings/O&G, LLC | 10.0% |
| United American Energy, LLC | 25.0% |
| Sagebrush Holdings/O&G, LLC | 4.5% |
| MRAH, LLC | 0.0% |
| **Total Monthly Allocation** | **100.0%** |

Notes:
1. This fee applies to the performance of services, as outlined in Exhibit B
2. This fee is subject to a reduction adjustment in the event one or more of the Operating Companies achieves a full liquidation. For example, once Madison Vineyard Holdings, LLC has been liquidated, in the month subsequent to the liquidation the Monthly Fee for the Operating Companies will be reduced by 40%.
3. The Monthly Fee is subject a minimum fee amount of $100,000 per month.

# EXHIBIT D

**District Court Litigation Complaint**

#38099374_v1

## IN THE UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **TMC Consulting Services, LLC,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) |
| | ) **Civil Action No. _____** |
| **RHSW (Cayman) Limited; Matthew Wright; and Christopher Kennedy,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## <u>COMPLAINT</u>

Plaintiff TMC Consulting Services, LLC ("Plaintiff"), by and through his undersigned counsel, alleges the following:

**I.    <u>Parties</u>**

1.    Plaintiff TMC Consulting Services, LLC, is a Delaware limited liability company with its principal place of business in Greenwood Village, Colorado.

2.    On information and belief, Defendant RHSW (Cayman) Limited is a foreign corporation organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

3.    Defendant Matthew Wright is employed by Defendant RHSW (Cayman) Limited and was appointed by Cayman Island courts as a liquidator of the funds and operating companies Plaintiff managed pursuant to the contract at issue in this case.  On information and belief, Defendant Wright resides in the Cayman Islands.

4.    Defendant Christopher Kennedy is employed by Defendant RHSW (Cayman) Limited and was appointed by Cayman Island courts as a liquidator of the funds and operating

companies Plaintiff managed pursuant to the contract at issue in this case.  On information and belief, Defendant Kennedy resides in the Cayman Islands.

## II.    Jurisdiction & Venue

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are completely diverse, and the amount in controversy exceeds $75,000.

6.      This Court has personal jurisdiction over all Defendants because they consented to the jurisdiction of the state and federal courts in Delaware in the forum selection clause in the contract at issue in this dispute.  That clause provides that the contract "shall be construed, enforced in and governed by the laws of the State of Delaware without regard to principals of conflict of laws to the extent that such principles would cause the laws of any other jurisdiction to apply.  Venue shall be confined to any Delaware State court or Federal court sitting in the State of Delaware."

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 and because the parties agreed in the forum selection clause in the contract at issue that venue would be proper in this Court.

## III.   Factual Allegations

### A.    The Consulting Agreement

8.      On October 15, 2014, Plaintiff entered into the "Amended and Restated Consulting Agreement" ("Consulting Agreement") with "MATTHEW WRIGHT and CHRISTOPHER KENNEDY of RHSW (Cayman) Limited ("***RHSW***"), the Joint Voluntary Liquidators (collectively, the "***Liquidators***") of the funds (each a "***Fund***", and collectively the "***Funds***") and their respective operating companies (each an "***Operating Company***", and collectively the "***Operating Companies***") set forth in <u>Exhibit A</u>" to the Consulting Agreement.

9.      Pursuant to the Consulting Agreement, Plaintiff agreed to act as a consultant to Defendants in the liquidation of the Funds and Operating Companies by managing those Funds and Operating Companies prior to their liquidation.  In return, Defendants agreed to cause the Funds to compensate Plaintiff pursuant to the terms set forth in Section 2 of the Consulting Agreement.  The Consulting Agreement permits Plaintiff to defer a portion of its monthly fees, with Defendants' consent.  Deferred fees earn interest and "become[] immediately due and payable upon the request of [Plaintiff]."

10.      Section 9 of the Consulting Agreement further provides in relevant part that it will continue in effect until December 31, 2015, and may not be terminated prior to that date except "by either [Defendants] or [Plaintiff] (A) upon the breach of this Agreement by another party if such breach is not cured within 30 calendar days of written notice of such breach to the breaching party . . . ."

**B.      Defendants' Breach of the Consulting Agreement**

11.      Plaintiff has complied with its obligations under the Consulting Agreement by managing the Funds and Operating Companies.  Pursuant to Section 2(d) of the Consulting Agreement and with Defendants' consent, Plaintiff elected to defer a portion of its monthly fees. The total deferred amount, with interest, will be $2,129,052.29 on July 3, 2015.

12.      On June 3, 2015, however, Plaintiff received a letter from Defendants alleging Plaintiff's breach of the Consulting Agreement, but refusing to provide the contractually mandated opportunity to cure.  The alleged breach involved an expenditure of funds Defendants claim was unwarranted.  Without regard to whether the alleged breach was cured, Defendants stated that, as a result of the alleged breach, they would terminate the Consulting Agreement on July 3, 2015.

13.     Plaintiff responded to Defendants' letter on June 4, denying the alleged breach; stating that if there were a breach, Plaintiff had cured it by obtaining the return of the expended funds; demanding payment of the deferred fees; and notifying Defendants that their purported termination of the Consulting Agreement constituted a breach of the Agreement for failure to allow an opportunity to cure.

14.     Defendants responded to Plaintiff's letter on June 7, reiterating their claim that Plaintiff had breached the Consulting Agreement and stating that they are not obligated to offer Plaintiff an opportunity to cure the alleged breach.

15.     After further discussions, Defendants sent Plaintiff another letter on June 18, acknowledging that Plaintiff is owed fees and deferred fees, but stating that they will only pay the fees owed through the Funds being liquidated, as if the fees owed to Plaintiff are fees owed by the Funds and subject to Cayman liquidation law, proceedings, and priorities.

## IV.     Legal Claims

### Declaratory Judgment Pursuant to 28 U.S.C. § 2201
### (Against All Defendants)

16.     Plaintiff repeats and re-alleges each of the allegations in Paragraphs 1-15 as if fully set forth herein.

17.     Defendants purported to terminate the Consulting Agreement, effective July 3, 2015, without providing Plaintiff its contractual right to cure any alleged breach.  In fact, Defendants have wrongfully refused to recognize Defendants' actual cure of the alleged breach. Under the circumstances, Defendants' purported termination of the Consulting Agreement constitutes a material breach of the Agreement.

18.     Thus, an actual controversy exists between the parties regarding whether Defendants' termination of the Consulting Agreement constitutes a material breach of that

Agreement. The controversy is real and immediate, and is ripe for judicial resolution. A declaratory judgment is needed to resolve existing uncertainty as to the parties' rights and obligations under the Consulting Agreement.

### Declaratory Judgment Pursuant to 28 U.S.C. § 2201
### (Against All Defendants)

19.     Plaintiff repeats and re-alleges each of the allegations in Paragraphs 1-18 as if fully set forth herein.

20.     Defendants are parties to the Consulting Agreement, and agreed unconditionally under Section 2 of the Agreement to cause the Funds to pay Plaintiff's deferred fees immediately upon demand. In their correspondence with Plaintiff, however, Defendants have asserted they are not obligated to cause the Funds to pay Plaintiff's deferred fees immediately upon demand, and that such fees are instead payable only through a liquidation process under Cayman law.

21.     Thus, an actual controversy exists between the parties as to whether Defendants are unconditionally obligated under the Consulting Agreement to cause the Funds to pay Plaintiff's deferred fees immediately upon demand. The controversy is real and immediate, and is ripe for judicial resolution. A declaratory judgment is needed to resolve existing uncertainty as to the parties' rights and obligations under the Consulting Agreement.

### Breach of Contract
### (Against All Defendants)

22.     Plaintiff repeats and re-alleges each of the allegations in Paragraphs 1-21 as if fully set forth herein.

23.     The Consulting Agreement constitutes a valid contract between Plaintiff and Defendants, in which Plaintiff agreed to provide services to Defendants in return for fees, as provided in the Consulting Agreement.

24.     Plaintiff has complied with its obligations under the Consulting Agreement by providing the contracted-for services to Defendants.

25.     Pursuant to Section 2 of the Consulting Agreement, Defendants agreed unconditionally to cause the Funds to pay any and all deferred fees immediately upon Plaintiff's request.

26.     Plaintiff demanded payment of all deferred fees and interest, which will total $2,129,052.29 as of July 3, 2015, in its June 4 letter to Defendants.  Defendants admit Plaintiff is owed fees and deferred fees, but have committed a material breach of the Consulting Agreement by refusing to cause the Funds to pay those amounts.

27.     Defendants' breach has directly and proximately caused Plaintiff to suffer damages including, but not limited to, deferred fees and interest totaling $2,129,052.29 as of July 3, 2015.

## V.     Prayer for Relief

WHEREFORE, Plaintiff respectfully requests the Court enter judgment as follows:

A.     Declaring that Defendants committed a material breach of the Consulting Agreement by purporting to terminate the Agreement effective July 3, 2015, failing to provide Plaintiff an opportunity to cure its alleged breach, and refusing to recognize Plaintiff's cure of its alleged breach;

B.     Declaring that Defendants are unconditionally obligated under the Consulting Agreement to cause the Funds to pay Plaintiff's deferred fees immediately upon demand, not through liquidation proceedings under Cayman law;

C.     Damages for Defendants' material breach of the Consulting Agreement by refusing to cause the Funds to pay to Plaintiff deferred fees and interest in an amount not less

than $2,129,052.29 as of July 3, 2015, including pre- and post-judgment interest and attorneys'

fees and costs to the extent permitted by law; and

        D.      Awarding Plaintiff such other relief as the Court deems just and proper under the

circumstances.

|  |  |
|---|---|
|  | ___/s/ Kelly E. Farnan___ |
| OF COUNSEL: | Brock E. Czeschin (#3938) |
| Timothy R. Beyer | czeschin@RLF.com |
| BRYAN CAVE LLP | Kelly E. Farnan (#4395) |
| 1700 Lincoln Street | farnan@rlf.com |
| Suite 4100 | Selena E. Molina (#5936) |
| Denver, CO  80203 | Molina@rlf.com |
| Telephone:      (303) 861-7000 | Richards, Layton & Finger, P.A. |
| Facsimile:      (303) 866-0200 | One Rodney Square |
| tim.beyer@bryancave.com | 920 North King Street |
|  | Wilmington, DE 19801 |
|  | (302) 651-7705 |

Dated:  June 18, 2015                  *Attorneys for Plaintiff*

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| TMC Consulting Services, LLC | RHSW (Cayman) Limited; Matthew Wright; Christopher Kennedy |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Brock E. Czeschin (#3938); Kelly E. Farnan (#4395); Selena E. Molina (#5936); Richards, Layton & Finger, 920 N. King St., Wilm., DE 19801, 302-651-7700

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question
*(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☒ 4 Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff* *(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332; 28 U.S.C. § 1391; 28 U.S.C. § 2201
Brief description of cause:
Declaratory judgment and breach of contract

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____

DOCKET NUMBER _____

DATE
06/18/2015

SIGNATURE OF ATTORNEY OF RECORD
*Kelly E. Farnan*

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

JS 44 Reverse (Rev. 12/12)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the six boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## EXHIBIT E

**Notice of Dismissal of District Court Litigation**

## IN THE UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| TMC Consulting Services, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | C.A. No. 15-512-SLR |
| | ) | |
| RHSW (Cayman) Limited; Matthew Wright; | ) | |
| and Christopher Kennedy, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## NOTICE OF DISMISSAL

Pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, Plaintiff TMC

Consulting Services, LLC, by its undersigned attorneys, hereby dismisses without prejudice the

Complaint in this action, with each party to bear its own fees and costs.

*/s/ Kelly E. Farnan*

Brock E. Czeschin (#3938)
czeschin@RLF.com
Kelly E. Farnan (#4395)
farnan@rlf.com
Selena E. Molina (#5936)
Molina@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7705

Dated:  November 16, 2015       *Attorneys for Plaintiff TMC Consulting Services,*
*LLC*

## EXHIBIT F

**Delaware Litigation Complaint**

22

**EFiled:  Nov 16 2015 07:26PM EST**
**Transaction ID 58171905**
**Case No. N15C-11-132 EMD CCLD**

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

### IN AND FOR NEW CASTLE COUNTY

|  |  |  |
|---|---|---|
| TMC Consulting Services, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Matthew Wright, Christopher Kennedy, | ) | |
| Madison Niche Opportunities Fund, | ) | |
| Ltd., Madison Niche Opportunities | ) | C.A. No. |
| Fund, LLC, Madison Niche | ) | |
| Opportunities Master Fund, Ltd., | ) | |
| Madison Niche Assets Fund, Ltd., | ) | |
| Madison Niche Assets Fund, LLC, | ) | |
| Madison Niche Assets Master Fund, | ) | |
| Ltd. | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff TMC Consulting Services, LLC ("Plaintiff" or "TMC"), by and

through its undersigned counsel, alleges the following:

### PARTIES

1.     Plaintiff is a Delaware limited liability company with its principal

place of business in Greenwood Village, Colorado.

2.     Defendant Matthew Wright  was appointed as a liquidator of the funds

and operating companies  more specifically described in the  Consulting

Agreement (as further defined herein) at issue in this case.  On information and belief, Defendant Wright resides in the Cayman Islands.

3.    Defendant Christopher Kennedy (together with Defendant Matthew Wright, the "Liquidators") was appointed as a liquidator of the funds and operating companies more specifically described in the Consulting Agreement (as further defined herein).  On information and belief, Defendant Kennedy resides in the Cayman Islands.

4.    Madison Niche Opportunities Fund, Ltd. is a Cayman Islands exempted limited liability company.

5.    Madison Niche Opportunities Fund, LLC is a Delaware limited liability company.

6.    Madison Niche Opportunities Master Fund, Ltd. is a Cayman Islands exempted limited liability company.

7.    Madison Niche Assets Fund, Ltd. is a Cayman Islands exempted limited liability company.

8.    Madison Niche Assets Fund, LLC is a Delaware limited liability company.

9.    Madison Niche Assets Master Fund, Ltd. is a Cayman Islands exempted limited liability company.

10.    The entities in Paragraphs 4-9 are each referred herein as a "Fund" and collectively as the "Funds."

## FACTUAL BACKGROUND

### A.    The Consulting Agreement

11.    On October 15, 2014, Plaintiff entered into the "Amended and Restated Consulting Agreement" ("Consulting Agreement") with Matthew Wright and Christopher Kennedy and each of the Funds.  The Consulting Agreement is attached hereto as Exhibit 1.

12.    Exhibit A to the Consulting Agreement defines the "Funds" to include Defendants Madison Niche Opportunities Fund, Ltd., Madison Niche Opportunities Fund, LLC, Madison Niche Opportunities Master Fund, Ltd., Madison Niche Assets Fund, Ltd., Madison Niche Assets Fund, LLC, and Madison Niche Assets Master Fund, Ltd and Operating Companies.

13.    Pursuant to the Consulting Agreement, Plaintiff agreed to provide consulting services with respect to the Funds and the Operating Companies described on Exhibit A and further detailed on Exhibit B to the Consulting Agreement on the terms and conditions set forth in the Consulting Agreement. In return, the Liquidators agreed to cause the Funds to compensate Plaintiff pursuant to the terms set forth in Section 2 of the Consulting Agreement, which includes fee, deferred fee, interest and late payment fee provisions.  The Consulting

Agreement permits Plaintiff to defer a portion of its monthly fees, with the Liquidators' consent.  Deferred fees earn interest and "become[] immediately due and payable upon the request of [Plaintiff]."  Section 9 of the Consulting Agreement further provides in relevant part that it will continue in effect until December 31, 2015, and may not be terminated prior to that date except "by either the Liquidators or [Plaintiff] (A) upon the breach of this Agreement by another party if such breach is not cured within 30 calendar days of written notice of such breach to the breaching party . . . ."

14.     Section 13 of the Consulting Agreement provides that the Consulting Agreement "shall be construed, enforced in and governed by the laws of the State of Delaware without regard to princip[les] of conflict of laws to the extent that such principles would cause the laws of any other jurisdiction to apply."  Section 13 of the Consulting Agreement further provides that "[v]enue shall be confined to any Delaware State court or Federal court sitting in the State of Delaware."

### B.     Defendants' Breach of the Consulting Agreement

15.     Plaintiff has complied with all its obligations under the Consulting Agreement by providing the contracted-for services to Defendants.  Pursuant to Section 2(d) of the Consulting Agreement and with the Liquidators' consent, Plaintiff agreed to defer a portion of its monthly fees.

16. On June 3, 2015, however, Plaintiff received a letter from the Liquidators alleging Plaintiff's breach of the Consulting Agreement, but refusing to provide the contractually mandated opportunity to cure. The alleged breach involved an expenditure of funds the Liquidators claim was unwarranted. Without regard to whether the alleged breach actually took place, whether it had been or could be cured, the Liquidators stated that, as a result of the alleged breach, they would terminate the Consulting Agreement in 30 calendar days from June 3, 2015. The June 3 letter is attached hereto as Exhibit 2.

17. At the time the Liquidators improperly purported to terminate the Consulting Agreement, Plaintiff was already owed substantial deferred fees and corresponding interest under the Consulting Agreement. Payment of accrued and deferred fees (plus interest and any late payment fees) is required regardless of whether the purported June 3 termination was proper.

18. Plaintiff responded to the Liquidators' letter on June 4, denying the alleged breach; stating that if there were a breach, Plaintiff had cured it by obtaining the return of the expended funds; notifying the Liquidators that their purported termination of the Consulting Agreement constituted a breach of the Agreement for failure to allow an opportunity to cure; demanding payment of all outstanding compensation due Plaintiff in accordance with Section 2 of the Consulting Agreement (including, but not limited to all deferred fees and interest

which are payable upon demand). Plaintiff's June 4 letter is attached hereto as Exhibit 3.

19.     The Liquidators responded to Plaintiff's letter on June 7, reiterating their claim that Plaintiff had breached the Consulting Agreement and stating that they are not obligated to offer Plaintiff an opportunity to cure the alleged breach. The June 7 letter is attached hereto as Exhibit 4.

20.     After further discussions, the Liquidators sent Plaintiff another letter on June 17, acknowledging that Plaintiff is owed fees and deferred fees, but stating that they agree to make payment of amounts due when sufficient liquidity becomes available. The June 17 letter is attached hereto as Exhibit 5.

21.     Despite the clear acknowledgement of the obligation to pay the amounts owed to Plaintiff, the Liquidators and the Funds refuse to make payment.

## COUNT I – BREACH OF CONTRACT
### (Against the Liquidators and the Funds)

22.     Plaintiff repeats and re-alleges each of the allegations in Paragraphs 1-21 as if fully set forth herein.

23.     The Consulting Agreement constitutes a valid contract between Plaintiff and Defendants, in which Plaintiff agreed to provide services to Defendants in return for compensation, as provided for under Section 2 of the Consulting Agreement.

24.    Plaintiff has complied with its obligations under the Consulting Agreement by providing the contracted-for services to Defendants.

25.    Pursuant to Section 2 of the Consulting Agreement, the Liquidators and the Funds agreed to pay any and all fees, deferred fees and interest immediately upon Plaintiff's request.  Plaintiff has requested payment of amounts due in accordance with Section 2 of the Consulting Agreement and the Liquidators and the Funds refuse to make payment.

26.    Pursuant to Section 9 of the Consulting Agreement, the Liquidators and the Funds agreed that termination would be proper only if Plaintiff breached the Consulting Agreement and failed to cure any alleged breach within 30 days.

27.    In the absence of a proper termination, the Consulting Agreement would remain in effect until at least December 31, 2015 and for at least 120 days thereafter. By letter dated June 3, 2015, the Liquidators and the Funds purported to terminate the Consulting Agreement without providing Plaintiff with the opportunity to cure.

28.    There is no basis in the Consulting Agreement for the Liquidators' and the Funds' purported termination and the actions of the Liquidators and the Funds constitute a breach of the Consulting Agreement.

29.    The Liquidators admit Plaintiff is owed amounts due under the Consulting Agreement including fees and deferred fees, and agreed to make said

payments but instead materially breached the Consulting Agreement by refusing to cause the Funds to pay those amounts.

30.     Plaintiff has been damaged in an amount to be proved at trial but not less than $4.5million as a result of the breaches by the Liquidators and the Funds as more particularly cited herein, including fees, deferred fees, late payment fees, fees that Plaintiff was entitled to under the Consulting Agreement absent breach, and interest.

WHEREFORE, Plaintiff respectfully requests the Court enter judgment as follows:

A.     Damages for Defendants' material breaches of the Consulting Agreement by refusing to cause the Funds to pay to Plaintiff all compensation owed as per Section 2 of the Consulting Agreement and improper termination under Section 9 of the Consulting Agreement including, but not limited to fees, deferred fees, late fees fees that Plaintiff was entitled to under the Consulting Agreement absent breach, and interest in an amount not less than $4.5 million, plus pre- and post-judgment interest and attorneys' fees and costs to the extent permitted by law; and

B.     Awarding Plaintiff such other relief as the Court deems just and proper under the circumstances.

*/s/     Kelly E. Farnan*

Brock E. Czeschin (#3938)
czeschin@RLF.com
Kelly E. Farnan (#4395)
farnan@rlf.com
Christine D. Haynes (#4697)
haynes@rlf.com
Selena E. Molina (#5936)
molina@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7705

*Attorneys for Plaintiff*

Dated:  November 16, 2015

## EXHIBIT G

**Bankruptcy Rule 7001.1 Disclosures**

#38099374_v1

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 15 |
|  | : |  |
| MADISON NICHE ASSETS | : | Case No. 16-_____ (___) |
| FUND, LTD. (IN OFFICIAL | : |  |
| LIQUIDATION),[1] *et al.*, | : | (Joint Administration Requested) |
|  | : |  |
| Debtors in | : |  |
| Foreign Proceedings. | : |  |
|  | : |  |
|  | : |  |

------------------------------------------------------------x

### FOREIGN REPRESENTATIVE'S STATEMENTS AND LISTS
### PURSUANT TO FED. R. BANKR. P. 1007(a)(4), 7007.1
### AND SECTION 1515(c) OF THE BANKRUPTCY CODE

I, CHRISTOPHER BARNETT KENNEDY, one of the duly appointed joint official liquidators, foreign representatives and chapter 15 petitioners ("**Petitioners**") for Madison Niche Opportunities Fund, Ltd. (in Official Liquidation) ("**Opportunities Fund**") and Madison Niche Assets Fund, Ltd. (in Official Liquidation) ("**Assets Fund**" and together with Opportunities Fund, the "**Funds**"), two Cayman Islands exempted limited companies both currently subject to the supervision of the Financial Services Division of the Grand Court of the Cayman Islands (the "**Grand Court**") (cause nos. FSD 0035 of 2015 (ASQC) (re the Assets Fund) and 0036 of 2015 (ASQC) (re the Opportunities Fund)) (the "**Cayman Liquidations**") pursuant to section 131 of the Companies Law of the Cayman Islands (2013 Revision) (the "**Companies Law**"), hereby submits the following information as required by Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure, which provides:

---

[1] The last four digits of the United States Tax Identification Number, or similar foreign identification number, as applicable, follow in parentheses:  Madison Niche Assets Fund, Ltd. (in Official Liquidation) (1425) and Madison Niche Opportunities Fund, Ltd. (in Official Liquidation) (0084).  The Funds' registered office is 2nd Floor, Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman, KY1-1103.

In addition to the documents required under § 1515 of the Code, a foreign representative filing a petition for recognition under chapter 15 shall file with the petition: (A) a corporate ownership statement containing the information described in Rule 7007.1; and (B) unless the court orders otherwise, a list containing the name and address of all persons or bodies authorized to administer foreign proceedings of the debtor, all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and all entities against whom provisional relief is sought under § 1519 of the Code.

Fed. R. Bankr. P. 1007(a)(4).

**Statement under Fed. R. Bankr. P. 7007.1**

Petitioners hereby state that certain entities own 10% or more of the equity of either of the Funds, set forth as follows:

| Fund | Entity |
| --- | --- |
| Assets Fund | GM 1 c/o Gutmann KAG |
| Assets Fund | Stichting Shell Pensioenfonds |
| Opportunities Fund | PBU Pension Fund of Early Childhood Teachers |

**Name and Address of All Joint Liquidators in Foreign Proceedings of the Company**

The following individuals, with the corresponding business address, have been duly appointed as Joint Official Liquidators of the Funds by the Grand Court

| Name and Address of Foreign Representative |
| --- |
| Matthew James Wright and Christopher Barnett Kennedy |
| RHSW (Cayman) Limited |
| Windward 1, Regatta Office Park |
| P.O. Box 897 |
| West Bay Road, Grand Cayman, KY1-1103 |
| Cayman Islands |

**Statement under Section 1515(c) of the Bankruptcy Code**

To the best of my knowledge, the Cayman Proceedings are the only foreign proceedings to which either of the Funds is subject.

**All Parties to Litigation in Which Either of the Funds is a**
**Party that is Pending in the United States at the Time of the Filing of the Petition**

To the extent known by the Official Liquidators, the parties to litigation pending in the

United States in which either of the Funds is currently a party are:

| Party | Type | Pending Litigation |
|---|---|---|
| TMC Consulting Services, LLC 5619 DTC Parkway, Suite 800, Greenwood Village, Colorado 80111 United States | Plaintiff | *TMC Consulting Services, LLC v. Matthew Wright, et al.*, Case No. N15C-11-132 EMD CCLD, Superior Court of Delaware, County of New Castle |
| Matthew Wright RHSW (Cayman) Limited Windward 1, Regatta Office Park P.O. Box 897 West Bay Road, Grand Cayman, KY1-1103 Cayman Islands | Co-Defendant | *TMC Consulting Services, LLC v. Matthew Wright, et al.*, Case No. N15C-11-132 EMD CCLD, Superior Court of Delaware, County of New Castle |
| Christopher Kennedy RHSW (Cayman) Limited Windward 1, Regatta Office Park P.O. Box 897 West Bay Road, Grand Cayman, KY1-1103 Cayman Islands | Co-Defendant | *TMC Consulting Services, LLC v. Matthew Wright, et al.*, Case No. N15C-11-132 EMD CCLD, Superior Court of Delaware, County of New Castle |
| Madison Niche Opportunities Funds, LLC c/o CSC, 2711 Centerville Road, Suite 400, Wilmington, DE 19808 United States | Co-Defendant | *TMC Consulting Services, LLC v. Matthew Wright, et al.*, Case No. N15C-11-132 EMD CCLD, Superior Court of Delaware, County of New Castle |
| Madison Niche Opportunities Master Fund, Ltd. The R&H Trust Co. Ltd., Windward 1, Regatta Office Park P.O. Box 897 West Bay Road, Grand Cayman, KY1-1103 Cayman Islands | Co-Defendant | *TMC Consulting Services, LLC v. Matthew Wright, et al.*, Case No. N15C-11-132 EMD CCLD, Superior Court of Delaware, County of New Castle |
| Madison Niche Assets Fund, LLC c/o CSC, 2711 Centerville Road, Suite 400, Wilmington, DE 19808 United States | Co-Defendant | *TMC Consulting Services, LLC v. Matthew Wright, et al.*, Case No. N15C-11-132 EMD CCLD, Superior Court of Delaware, County of New Castle |

| Madison Niche Assets Master Fund, Ltd. The R&H Trust Co. Ltd., Windward 1, Regatta Office Park P.O. Box 897 West Bay Road, Grand Cayman, KY1-1103 Cayman Islands | Co-Defendant | *TMC Consulting Services, LLC v. Matthew Wright, et al.*, Case No. N15C-11-132 EMD CCLD, Superior Court of Delaware, County of New Castle |
|---|---|---|

**<u>All Entities Against Whom Provisional Relief is Sought under 11 U.S.C. § 1519</u>**

Petitioners are not seeking provisional relief.

I declare, under penalty of perjury under the laws of the United States of America, that the information set forth above is based on my current knowledge, information and belief after reasonable inquiry, and in contemplation of and subject to supplementation, true and correct.

Executed on this ___8th___ day of January, 2016

_____
CHRISTOPHER BARNETT KENNEDY

#37686077_v3